## UNITED STATES v. LINDSLY.

(District Court, E. D. Louisiana, New Orleans Division. July 11, 1925.)

No. 8412.

1. **Arrest ⊝63(1)—Searches and seizures ⊝3—Statute held not to change law as to right to arrest a person or enter his dwelling without a warrant, if he is committing an offense in presence of officers.**

Act Nov. 23, 1921, § 6 (Comp. St. Ann. Supp. 1923, § 10184a), denouncing as a misdemeanor search of any private dwelling without a warrant, merely makes a crime out of acts that were theretofore illegal trespasses in violation of the Fourth Amendment, and does not change the law as to right to arrest a person or to enter a dwelling without a warrant, if and when, in the presence of the officers, as made known to them by their sense of sight, hearing, or smell, he is committing an offense.

2. **Statutes ⊝217—Courts not bound, in interpreting law, by language used by a committee of Congress.**

Courts are not bound, in interpreting the law, by language used by a committee of Congress, especially a committee of one of the houses in opposing amendment adopted by the other house.

3. **Intoxicating liquors ⊝249—Entry of officers into defendant's premises for search of intoxicating liquors without a warrant held justified.**

Where officers saw barrels and other objects in defendant's house before they entered the yard from the adjoining premises, and saw and smelled wine in the yard before they entered the premises, *held*, that there was ample proof of commission of an offense in their presence, which, under Act Nov. 23, 1921, § 6 (Comp. St. Ann. Supp. 1923, § 10184a), justified them in entering the premises without a warrant.

4. **Criminal law ⊝958(4)—Ex parte affidavit, contradicting testimony given by witness in open court, not treated as worthy of belief.**

In liquor prosecution, ex parte affidavit of witness, contradicting testimony given by him in open court, when he was subjected to cross-examination, could not be treated as worthy of belief.

5. **Criminal law ⊝958(4)—Ex parte affidavits prepared for signature of witness have not same evidentiary value as sworn testimony of same witness in open court.**

Ex parte affidavits, prepared by some one else for signature of witness, have not the same evidentiary value as the sworn testimony in open court of the same witness, supported by his written report signed by him, which he then verified as truthful.

6. **Criminal law ⊝409 — Defendant's ownership of wine and articles for manufacturing it could be inferred from his affidavit on motion to suppress the evidence.**

In liquor prosecution, defendant's ownership of the wine and articles designed to manufacture it could be inferred from his affidavit

on motion to suppress the evidence, wherein he claimed the house and premises where wine and articles were found.

**7. Criminal law ⊂∞406(4), 1036(1)—Admission of affidavit, made on motion to suppress evidence to show defendant's ownership of wine and articles designed to manufacture it, held not ground for complaint.**

In liquor prosecution, admission of defendant's affidavit, made on motion to suppress the evidence, to show his ownership of the wine and articles designed to manufacture it, held not ground for complaint, where defendant did not object to its introduction, and it was a voluntary affidavit, made and filed in the record, thereby being equivalent to any other admission or confession by defendant showing or tending to show his guilt.

Walter Lindsly was convicted of violating the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.). On motion for new trial. Motion denied.

A. A. de la Houssaye, of New Orleans, La., for the United States.

Girault Farrar, E. I. Mahoney, and E. C. Hollins, all of New Orleans, La., for defendant.

BEATTIE, District Judge. The principal ground for the motion for new trial is that the court overruled the motion to suppress evidence made and heard before the trial on the merits, and permitted the government witnesses to testify to certain facts learned as a result of their entering of the premises and dwelling of the defendant. This entering was without a search warrant, and because of this it is claimed that all facts learned as a result of it should have been excluded from the jury. There were sufficient facts discovered by the government witnesses before the entering of the defendant's property to justify a submission of the merits of the case to a jury, but still, if evidence of the facts learned as a result of the entering was illegal and should have been excluded, a new trial should be granted, despite the fact that there might have been sufficient evidence without this to justify a conviction.

Under the facts as developed on the motion to suppress the evidence, the court concluded that a search warrant was unnecessary, as the evidence showed that before the government officers entered the property, they had ample knowledge through their senses of sight and smell, that an offense was being committed in their presence, and the court considered that the law justified the arrest of an offender and the entering of his property by the government officers for this purpose, as well as for the purpose of search, if and when a violation of the law was being committed in their presence, and the court considered that the law justified the introduction before the jury of any evidence discovered at the time of the arrest of the offender or of the entering of his property, if and when the officers were justified in making either such arrest (which in this case was not made, as defendant was absent), or such entry because of their knowledge, through their senses, of the commission of an offense then taking place in their presence.

The Court of Appeals of this Circuit, in McBride v. U. S., 284 F. 416, 419, said: "At common law it was always lawful to arrest a person without warrant, where a crime was being committed in the presence of an officer and to enter a building without warrant, in which such crime was being perpetrated. * * * Where an officer is apprised by any of his senses that a crime is being committed, it is being committed in his presence, so as to justify an arrest without warrant."

In the same case, on page 418, the court said: "Treating this stable as falling within the description of places covered by the Fourth Amendment, the question in this case is: Can an officer, without warrant, enter upon premises whereon he is informed by his senses a crime is being committed, and, having entered, finding a crime in progress, without warrant arrest the offenders and testify as to what such entry discloses? The case does not involve the taking of papers, or the use of any papers or property of the defendant in evidence against him."

Again, on page 419, the court said: "The entry on these premises and into the stable was not to search for evidence, but, upon ascertaining that whisky was in process of manufacture thereon, to arrest those engaged in the commission of an offense then in progress. If an entry can be made without warrant in cases where the officers acquire information evidencing the present commission of a crime, then the use of knowledge acquired by such entry is not the use of knowledge illegally acquired."

This case was decided long after the act of 1921, relied on in the case at bar, and the court made no reference to it. It is true, however, that in this case, there was no question involved of the search of a dwelling. But I understand the rule laid down by the court in this case, relative to the present commission of a crime, made known to the officers by any of their senses, and relative to the right of entry and of arrest without a

warrant, applies as well to dwellings as to any other buildings, if and when a crime is being committed in the presence of the officers.

After the denial of the motion to suppress evidence, and after the admission of the evidence before the jury and the conviction of the defendant, his motion for a new trial, based upon practically the same grounds as the motion to suppress evidence, when first heard, was overruled, and sentence was imposed upon the defendant. Thereafter defendant called attention to section 6 of Act Nov. 23, 1921 (Comp. St. Ann. Supp. 1923, § 10184a), entitled "an act supplemental to the National Prohibition Act."

This section provides "that any officer, agent or employee of the United States engaged in the enforcement of this act, or the National Prohibition Act, or any other law of the United States, who shall search any private dwelling as defined in the National Prohibition Act, and occupied as such dwelling, without a warrant directing such search, or who while so engaged shall without a search warrant maliciously and without reasonable cause search any other building or property, shall be guilty of a misdemeanor."

The court then set aside the sentence and reopened the motion for new trial and permitted additional argument, and the question now is whether this section of the act of 1921, which had not theretofore been called to the attention of the court, has changed the law in any respect from what it was before its enactment, so far as concerns the admissibility before the jury of the testimony in this and similar cases. Before the enactment of this section, it was an illegal trespass and invasion of a person's property to unreasonably search it, and this whether it were a dwelling or not. And, as a result of the illegality of such a search, the courts have repeatedly held that evidence obtained thus illegally as a result of such a search should be suppressed and not admitted before the jury.

Section 6 of the act of 1921 merely makes a misdemeanor (authorizing a fine and imprisonment of one convicted thereof) of the same acts which prior to that time were illegal trespasses and invasions of a person's property, but not crimes. Though prior to 1921 such acts were not crimes, it had been repeatedly held, as above stated, that any evidence obtained as a result of such acts, which were then illegal trespasses and invasions of a person's rights in violation of the Fourth Amendment, should be suppressed and excluded from the jury.

I do not think that the making of the same acts a crime by the act of 1921 changes in any way the law that prior to that time existed relative to the admissibility of such evidence.

If, in the case at bar, the evidence was discovered and obtained as a result of an act which, prior to the act of 1921, was an illegal trespass and invasion of the defendant's property in violation of the Fourth Amendment, then it was inadmissible without regard to section 6 of the act of 1921, and the passage of that act does not make it any the more inadmissible, for that act has merely the effect of making a crime out of acts which had theretofore been illegal trespasses and violations of the Fourth Amendment.

The question, therefore, now to be determined in this case, is whether the evidence admitted before the jury should have been excluded because obtained as a result of a violation of the Fourth Amendment.

While the act of 1921 makes it a crime to search a dwelling without a warrant, I think this act must be construed in view of the law as it existed prior to 1921, and as being intended merely to make a crime of a search of a dwelling, which prior to that time was an illegal trespass, but not a crime.

I do not believe that Congress intended, by the act of 1921, to completely change the law as it has existed in this country and in England, from which we derive our laws, for many years, and I do not believe, therefore, that Congress intended to make every entry of a dwelling without a warrant a crime, but intended to make only those entries or searches without warrants crimes which theretofore had been illegal trespasses. I do not think that that statute was intended to make a crime of searches that had theretofore been legal, such as searches resulting from the entering of a dwelling authorized and made necessary because of the perpetration of a crime in the presence of the law officers. Could Congress have intended to make a crime out of the entering of a dwelling without a warrant, if, within the plain sight of the officers while outside of the dwelling and the premises of the defendant, they saw a murder or other crime, whether it be a felony (such as a second offense of manufacture or sale, or third offense of possession of liquor) or a misdemeanor, being committed? Was this law intended to change the law that had existed for so many centuries, which, as the Court of Appeals held in the McBride Case, supra,

justified the arrest of a person without warrant by an officer, where a crime was being committed in his presence, and justified the officer to enter the building without a warrant, where he saw the crime being committed?

If Congress did not intend to forbid and make a crime out of that which had theretofore been entirely justified and lawful, then section 6 of the act of 1921 must be held to mean that the search of a dwelling without a warrant there referred to was the search and entering of a dwelling in cases other than where, in the presence of the law officers, a crime was being committed within their sight and hearing, or as made known to them by any one of their senses.

Chief Justice Taft, in the case of Carroll v. U. S., 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, decided March 2, 1925, stated the law to be just as has been heretofore stated by the Court of Appeals of this circuit in the McBride Case, supra. Chief Justice Taft said in that case: "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence."

And again, a little further on in the opinion, the Chief Justice said: "The argument for defendants is that, as the misdemeanor to justify arrest without warrant must be committed in the presence of a police officer, the offense is not committed in his presence unless he can by his senses detect that the liquor is being transported, no matter how reliable his previous information by which he can identify the automobile as loaded with it. * * * So it is that under the rule contended for by defendants the liquor if carried by one who has been already twice convicted of the same offense, may be seized on information other than the senses, while, if he has been only once convicted, it may not be seized unless the presence of the liquor is detected by the senses as the automobile concealing it rushes by."

In the same case the Chief Justice said: "When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution."

In Boyd v. U. S., 116 U. S. 616, 623, 6 S. Ct. 524, 528 (29 L. Ed. 746), the court said: "The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. * * * So also the laws which provide for the search and seizure of articles and things which it is unlawful for a person to have in his possession for the purpose of issue or disposition, such as counterfeit coin, lottery tickets, implements of gambling, etc., are not within this category [category of unreasonable search and seizure]."

In Gouled v. U. S., 255 U. S. 309, 41 S. Ct. 265, 65 L. Ed. 647, the court, speaking of search warrants, said: "They may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding, but that they may be resorted to only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or when a valid exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken."

It is true that, in the case last cited, reference was made to search warants, while in the case at bar there was no search warrant, but still the court points to the difference between gaining access to a man's house solely for the purpose of securing evidence to be used against him, and gaining access when there is a primary right to search and seize property such as liquor and articles designed to make liquor, which are declared to be contraband, and in which there are no property rights.

In Weeks v. U. S., 232 U. S. 392, 34 S. Ct. 344, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, the court said: "It [the case] is not an assertion of the right on the part of the government, always recognized under English and American law to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime. * * * Nor is it the case of burglar's tools or other proofs of guilt found upon his arrest within the control of the accused."

In the same case (page 395, 34 S. Ct. 345) the Supreme Court said, referring to certain papers that had been found in the execution of a search warrant issued for other things than these papers: "Their offer in testimony did not violate his constitutional priv-

lege against unlawful search or seizure, for it was held that such incriminatory documents thus discovered were not the subject of an unreasonable search and seizure, and in effect that the same were incidentally seized in the lawful execution of a warrant and not in the wrongful invasion of the home of the citizen and the unwarranted seizure of his papers and property."

In Carroll v. U. S., supra, the court, after citing Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, Silverthorne Lumber Co. v. U. S., 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319, Gouled v. U. S., 255 U. S. 309, 41 S. Ct. 265, 65 L. Ed. 647, Weeks v. U. S., 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, and Amos v. U. S., 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654, said: "In none of the cases cited is there any ruling as to the validity under the Fourth Amendment of a seizure without a warrant of contraband goods in the course of transportation and subject to forfeiture or destruction."

In the same case the court said: "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens."

Again, in the same case, the court said: "Section 26, Title 2 of the National Prohibition Act [like other laws there referred to] was enacted primarily to accomplish the seizure and destruction of contraband goods; secondly, the automobile was to be forfeited; and, thirdly, the driver was to be arrested. * * * The main purpose of the act obviously was to deal with the liquor and its transportation, and to destroy it * * * [and] section 26 was intended to reach and destroy the forbidden liquor in transportation and the provisions for forfeiture of the vehicle and the arrest of the transporter were incidental."

Again: "In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his peril unless he can show the court probable cause."

Again: "As the main purpose of section 26 was seizure and forfeiture, it is not so much the owner as the property that offends."

Again: "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for believing that the contents of the auto-

mobile offend against the law. The seizure in such a proceeding comes before the arrest as section 26 indicates."

Again: "The character of the offense with which, after the contraband liquor is found and seized, the driver can be prosecuted does not affect the validity of the seizure."

Again: "This conclusion is in keeping with the requirements of the Fourth Amendment and the principles of search and seizure of contraband forfeitable property."

[1] For the reasons and upon the authorities above cited, I have reached the conclusion that the law as to the right to arrest a person, or to enter his dwelling without a warrant, if and when, in the presence of the officers, as made known to them by their sense of sight, hearing, or smell, he is committing an offense, has not been changed by section 6 of the act of 1921, which merely makes a crime out of acts that were theretofore illegal trespasses, in violation of the Fourth Amendment, and I have concluded, therefore, that as prior to 1921 the law justified the arrest of a person and the entering of his house without a warrant if and when he was committing an offense in the presence of law officers, and further justified the use in evidence against him of any knowledge and of any property, particularly contraband and forfeitable property, then found on his person and in his house, and held such an arrest and such an entering of his house not to be illegal or a wrongful invasion of his rights under the Fourth Amendment, so now, under the same circumstances, officers may arrest and enter his house and use the knowledge and evidence then and there obtained in spite of the act of 1921, which, as above stated, merely makes a crime out of those acts that were theretofore illegal trespasses and violations of the Fourth Amendment. Evidence obtained as a result of such trespasses was no less wrongfully obtained than, if now obtained, since said trespasses have been made crimes.

While, in view of the language of the Judiciary Committee of the House, as quoted in the case of Carroll v. U. S., supra, there may be some doubt as to the correctness of my conclusion, I have, after careful consideration, determined that it is the correct interpretation of the law, but shall be glad to have an authoritative ruling on this important question.

[2] I do not think that the courts are bound, in interpreting the law, by the language used by a committee of Congress, and particularly a committee of one of the hous-

es in opposing an amendment adopted by the other house, and when it is natural for the committee to go to extremes in their arguments against the opposed amendment. Moreover, the statements in a report of the committee of one house may not meet with the concurrence of its own members, and certainly may not meet with the concurrence of the members of the other house.

The report of the committee I now refer to, as found in the Carroll Case, supra, referring to the Senate amendment that was objected to, said: "The Senate amendment prohibits all search or attempt to search any property or premises without a search warrant. The effect of that would necessarily be to prohibit all search, as no search can take place if it is not on some property or premises. Not only does this amendment prohibit search of any lands but it prohibits the search of all property. It will prevent the search of the common bootlegger and his stock in trade, though caught and arrested in the act of violating the law. But what is perhaps more serious it will make it impossible to stop the rum-running automobiles engaged in like illegal traffic."

While this report says that the Senate amendment (which in the case of a dwelling is practically the same as the law as finally adopted in conference) prohibits all search of any property, and would prevent the search of the common bootlegger and his stock in trade, though caught and arrested in the act of violating the law, yet I think that, in spite of this, the law does not prohibit or prevent all search, and particularly the search of a bootlegger and his stock in trade, when caught and arrested in the act of violating the law, and more particularly that the law does not prohibit the entering into a house, whether it be a dwelling or not, when, within the sight of the law officers, a crime is being committed in that building in their presence, and this whether the owner of the building and the resident of the dwelling happened then to be present or absent.

The one committee of the one house, in using this language, did not have in mind the general law permitting arrests and permitting the entering of dwellings in order to stop the commission of an offense then being perpetrated in the presence and view of the law officers. Such a statement by the committee of one house—never probably made known to the other house, and possibly not even known to the general membership of that house itself—cannot be a guide to the interpretation of clear language, and cannot justify an interpretation that means the repeal and rejection of what has been recognized for centuries as the general law on the subject of arrest and entering of houses for the prevention of crime then being committed in the presence and view of the law officers.

Having now reached the conclusion that the entry of the officers into the dwelling of the defendant might be made by the officers if a crime was then and there being committed in their presence, I will now examine the facts to see whether, under the facts, their entry was justified.

Hugh Dearie, a former prohibition officer (now out of the service), was called by the defendant and testified that, owing to the length of time since the incident, his memory of the facts was not perfect, but admitted that his official report at the time was made when the facts were known to him, and was truthful, and would not have been made if it did not state the facts. This report, which was read in evidence, showed that he saw a winery in full operation in the basement of defendant's residence. He said that his report stated that they looked through a fence hole and saw the winery in operation, and that was why they entered. When testifying, he did not recollect the exact facts, but stated positively that the report was true at the time, and that he would not have made the report if the facts therein stated were untrue. He stated that the wine was all dumped all over the yard before they got there and got into the place and before they got into the defendant's yard. He said that he would not have made the statement in the report that he had seen the winery through the fence if at the time he did not know it to be a fact. This was the witness called by the defendant on the motion to suppress the evidence.

The government witnesses showed that, after being refused admission into the house by the defendant's wife, because they did not have a search warrant, one remained there while the other went to get a search warrant (which, however, seems never to have been gotten, because, as the evidence suggests, no commissioner could then be found). The one that remained heard some one in defendant's property turning barrels upside down. He then went to the property adjoining the defendant's property in the rear and received permission of the occupant of the adjoining property to look through and over the fence separating the properties, and when there the man inside

saw him, the government officer, and then the officer went back in the front, and this man jumped over the back fence and was pursued by the officer until he reached St. Charles avenue, when he flagged a truck, and the officer could not catch him, and then went back to the location near defendant's property, and says that through or over the fence, in plain view, the back door being open, he could see a complete winery, and would judge that about two-thirds of the stuff had been poured out, and some of it was then running on the street before the officers had touched a barrel. According to his testimony, most of the material was dumped out before the officers got over the fence and went into the place.

Officer Needham says he saw the man dumping the wine. He says that the back door was open, and he could see the wine all over the floor; that it was a complete winery, about 50 or 60 barrels, and possibly 20 or 30 of them had been poured out, and these things could be seen before he entered the property. He said that the wine was seen running all over the yard and in the gutter and outside of the yard.

Agent Needham's testimony was to some extent confirmed by Agent Fremaux, who, however, arrived on the scene only after the entry of the other officers into the premises, but as he (Fremaux) judged, before the other officers had begun to destroy anything, and, when Fremaux got in front of defendant's property, he could see wine running from the driveway in front of a wooden garage into the yard, out of the front gate, and into the gutter.

Agent Needham, recalled, said that, before he got over the fence into defendant's property, he could see the wine that had been poured out by the man above referred to, and this wine was in the yard and all around, and the place was flooded with wine; possibly 30 or 35 barrels of wine had been turned over before he went into the premises. He could not say positively that he had seen the wine press (later found there) before he entered the premises, but he could see a number of barrels and could see the wine. He heard the man underneath the house when he started dumping the wine, and could smell the odor of the wine then more so than he could before. Again he says that he saw the mash and the wine running all over the yard and all over the place.

After hearing this evidence and other evidence, the court denied the motion to suppress the evidence, and later permitted the government witnesses to testify to what they had seen after they entered the premises, as well as to what they had seen before they entered the premises.

No actual physical evidence, taken as a result of the entry, was offered before the jury. The motion to suppress, as stated in the note of evidence, was denied on the authority of McBride v. U. S., supra, In re Mobile (D. C.) 278 F. 949, Schwartz v. U. S. (C. C. A.) 294 F. 528, U. S. v. Borkowski (D. C.) 268 F. 408, U. S. v. Apple and U. S. v. Huff (D. C.) 1 F.(2d) 493, and also for the reason that, under section 25 of the National Prohibition Act, I considered that the premises were being used for business purposes; that is, the manufacture of intoxicating liquor in the quantity shown by the evidence.

See, also, Tritico v. U. S., 4 F.(2d) 664, decided by Fifth Circuit Court of Appeals February 17, 1925, citing McBride v. U. S., and upholding the search without a warrant of a building (not a residence) when the officers were made aware, through their senses, that the prohibition law was being violated.

See, particularly, Hester v. U. S., 265 U. S. 57, 44 S. Ct., 445, 68 L. Ed. 898, holding admissible testimony of officers to the finding of whisky near the house where the defendant resided, though the witnesses had no warrant and were trespassers on the land, and holding the Fourth Amendment does not extend to open fields, which from the context I interpret would include the yard around a residence. In this case the court said, page 58 (44 S. Ct. 446): "The officers had no warrant for search or arrest. * * * The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. This evidence was not obtained by the entry into the house and it is immaterial to discuss that. * * * As to that, it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields."

In this last-cited case the officers were on the property where the residence was situated without a warrant, and the evidence thus obtained was held admissible. In that case one officer entered the house, but found there no whisky. The whisky was found outside the house. In the case at bar, the officers saw the barrels and other objects

in the house before they entered the yard from the adjoining premises, and saw and smelled the wine in the yard before they entered the premises, and thus had knowledge, before entering the premises, of the offense being committed in their presence. The cited case upholds the admissibility in the case at bar of not only what the officers saw before entering the premises, but what they saw (much the same thing) after they entered the premises, but before entering the house. This decision was rendered long after the act relied on of November 23, 1921, supra.

[3] From the evidence above referred to, I held at the time of trial, and I still believe, that there was ample proof of the commission of an offense in the presence of the officers, which, under the law above referred to, justified them in entering the premises.

[4, 5] On the motion for a new trial, the ex parte affidavit of Hugh Dearie, the same man who testified on behalf of the defendant on the motion to suppress, was produced. This ex parte affidavit contradicts the testimony given by the same witness in open court when he was subject to cross-examination, and cannot be treated as worthy of belief. Ex parte affidavits prepared by some one else for the signature of a witness have not the same evidentiary value as the sworn testimony in open court of the same witness supported by his written report signed by him, which he then verified as truthful.

On the motion for new trial, the defendant offered in evidence a lot of photographs, with a view of showing that, because in the photographs it does not appear that you can see into the basement where the wine was supposed to be, therefore the testimony of both witnesses that before entering the premises they could see, through or over the fence, the barrels of wine in this basement, was untruthful. Even if it be conceded that the government witnesses could not see into the basement, yet they could see the wine, if any, that ran out of the basement and all over the yard, which they testified to. Moreover, the photographs were taken at a different hour from the hour at which the witnesses said they were looking through the fence. The photographs, according to the ex parte affidavit of the photographer, were taken at 1 p. m. in the afternoon on June 15, 1925, and the government witnesses were looking through and over the fence about 3 or 3:30 p. m. January 30, 1924. The position of the sun and the question as to whether or not there was equal sunlight on the two different days would play an important part in determining whether the photographs would show as much as could be seen with the eye.

While I do not know, it appears to me that a photograph, taken by a camera directed toward and into a shed through an open door, would show a shadow or dark background, and would not disclose as much as could be seen inside of the shed or basement with the naked eye. The photographs themselves, if taken at the same hour, might show the same object differently. In one of the photographs the door seen through and under the wash shed leading into the basement is much more distinct than in the other.

The photographs are verified only by the ex parte affidavit of the photographer, who was not produced for cross-examination. No complaint of surprise was made at the time of trial in order that the defendant might seek evidence, either by photograph or otherwise, to show what he now proposes to show by this new evidence on motion for new trial; namely, that the government witnesses could not see what they testified they did see.

In view of the contentions in the motion for a new trial that the government witnesses could not have seen, before they entered the premises, what they claim to have seen, and on the basis of which the court overruled the motion to suppress the evidence, a very wide latitude was allowed after the motion for new trial was made and during the pendency of it, for an examination of the premises and for observations to be made from the same point or points from which the government witnesses made their observations before entering the premises. The defendant had the premises examined, and introduced evidence, both in open court and by affidavit, of the result of this examination, and at my request an examination of the premises was made, and testimony as to the results was offered in open court, with the privilege granted to, and exercised by, the defendant to cross-examine the witnesses. This evidence was sufficient to satisfy me that the government witnesses could see, from the places and points from which they made their observations before entering the premises, that which they testified they did see, and on the basis of which the motion to suppress evidence was denied, because I concluded that the government witnesses could (as they testified they did) learn and know from their senses before entering that a crime was being committed in their presence. The testimony taken pending the decision of the motion for a new trial as above

stated showed that the wine could have run out of the basement into the yard through one of the doors of the basement, the threshhold of which was even with the floor of the basement, and the conditions were not, as alleged in the motion for a new trial, such as to prevent the wine from flowing from the basement (when and if therein emptied from the barrels) out into the yard, where the government witnesses claim to have seen it and smelled it before entering the premises. This testimony further showed that, from the position occupied by the government witnesses before entering the premises, they could have seen barrels and other things in the basement.

In his motion for a new trial, the defendant refers to the case of Truxillo v. U. S. No reference to the volume or page is given, and I know of no such decision. If by this reference it is intended to refer to the case of Tritico v. U. S., 4 F.(2d) 664, recently decided by the Court of Appeals of this circuit, this case referred only to the sentence that could be imposed under the conditions there mentioned, and in the case at bar, it will be followed.

In his motion for a new trial, the defendant complains that there was no evidence to show his ownership of the wine and articles designed to manufacture wine. The testimony of the defendant's wife was offered, and, as the government made no objection to it, she was permitted to testify. From her testimony it is probable that the jury were justified, in the absence of anything to the contrary, in properly inferring that the defendant was the occupant of the premises and the owner of the contents.

[6] Moreover, the government offered in evidence the affidavit of the defendant himself, made with a view and in connection with the motion to suppress the evidence, from which affidavit his ownership may be inferred and concluded, as he therein claimed the house and premises. The offer of this affidavit was made by the district attorney, and no objection whatever was made to its introduction, by the defendant, at the time of the offer, or until after the verdict. The court then had some doubt as to the propriety of its offer, particularly if it had been objected to, but while, on second consideration, the court does not believe that it was improperly admitted, yet it is a legal question that the court would be glad to have passed upon authoritatively by the appellate court.

[7] The objection now made to the offer of this evidence, and which forms one of the bases for the motion for a new trial, is that it was obtained in violation of the Fourth and Fifth Amendments of the Constitution, since, as I understand the contention, it is claimed this affidavit was intended only for the motion to suppress the evidence, and therefore was not usable before the jury, and, when used, was tantamount to forcing the defendant to testify against himself.

In the first place, there was no objection on behalf of the defendant to the offer and introduction of the evidence. In the second place, it was a voluntary affidavit, made and filed in the record, and thus became, I think, equivalent to any other admission or confession made by the defendant of any facts showing or tending to show his guilt.

There is no question that an admission made by him, under other circumstances, of the facts, if voluntary, would have been admissible in evidence. Does the fact that this admission was made in an affidavit to suppress evidence make it inadmissible, particularly when it was made without reservation and voluntarily, and then, when offered in evidence by the government, was permitted to be read to the jury without any objection whatever? Even if it would have been inadmissible if it had been objected to, was it inadmissible in the absence of objection?

For the foregoing reasons, the motion for a new trial is denied.