## SIMMONS ET AL. *v.* UNITED STATES.

No. 55.   Argued January 15, 1968.—Decided March 18, 1968.

*Raymond J. Smith* argued the cause for petitioners. With him on the brief were *John Powers Crowley* and *George F. Callaghan.*

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Vinson, Beatrice Rosenberg* and *Mervyn Hamburg.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case presents issues arising out of the petitioners' trial and conviction in the United States District Court for the Northern District of Illinois for the armed robbery of a federally insured savings and loan association.

The evidence at trial showed that at about 1:45 p. m.

on February 27, 1964, two men entered a Chicago savings and loan association. One of them pointed a gun at a teller and ordered her to put money into a sack which the gunman supplied. The men remained in the bank about five minutes. After they left, a bank employee rushed to the street and saw one of the men sitting on the passenger side of a departing white 1960 Thunderbird automobile with a large scrape on the right door. Within an hour police located in the vicinity a car matching this description. They discovered that it belonged to a Mrs. Rey, sister-in-law of petitioner Simmons. She told the police that she had loaned the car for the afternoon to her brother, William Andrews.

At about 5:15 p. m. the same day, two FBI agents came to the house of Mrs. Mahon, Andrews' mother, about half a block from the place where the car was then parked.[1] The agents had no warrant, and at trial it was disputed whether Mrs. Mahon gave them permission to search the house. They did search, and in the basement they found two suitcases, of which Mrs. Mahon disclaimed any knowledge. One suitcase contained, among other items, a gun holster, a sack similar to the one used in the robbery, and several coin cards and bill wrappers from the bank which had been robbed.

The following morning the FBI obtained from another of Andrews' sisters some snapshots of Andrews and of petitioner Simmons, who was said by the sister to have been with Andrews the previous afternoon. These snapshots were shown to the five bank employees who had witnessed the robbery. Each witness identified pictures of Simmons as representing one of the robbers. A week or two later, three of these employees identified photo-

---

[1] Mrs. Mahon also testified that at about 3:30 p. m. the same day six men with guns forced their way into and ransacked her house. However, these men were never identified, and they apparently took nothing.

graphs of petitioner Garrett as depicting the other robber, the other two witnesses stating that they did not have a clear view of the second robber.

The petitioners, together with William Andrews, subsequently were indicted and tried for the robbery, as indicated. Just prior to the trial, Garrett moved to suppress the Government's exhibit consisting of the suitcase containing the incriminating items. In order to establish his standing so to move, Garrett testified that, although he could not identify the suitcase with certainty, it was similar to one he had owned, and that he was the owner of clothing found inside the suitcase. The District Court denied the motion to suppress. Garrett's testimony at the "suppression" hearing was admitted against him at trial.

During the trial, all five bank employee witnesses identified Simmons as one of the robbers. Three of them identified Garrett as the second robber, the other two testifying that they did not get a good look at the second robber. The District Court denied the petitioners' request under 18 U. S. C. § 3500 (the so-called Jencks Act) for production of the photographs which had been shown to the witnesses before trial.

The jury found Simmons and Garrett, as well as Andrews, guilty as charged. On appeal, the Court of Appeals for the Seventh Circuit affirmed as to Simmons and Garrett, but reversed the conviction of Andrews on the ground that there was insufficient evidence to connect him with the robbery. 371 F. 2d 296.

We granted certiorari as to Simmons and Garrett, 388 U. S. 906, to consider the following claims. First, Simmons asserts that his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to misidentification as to deny him due process of law, or at least to require reversal of his conviction in the exercise of our supervisory power

over the lower federal courts. Second, both petitioners contend that the District Court erred in refusing defense requests for production under 18 U. S. C. § 3500 of the pictures of the petitioners which were shown to eyewitnesses prior to trial. Third, Garrett urges that his constitutional rights were violated when testimony given by him in support of his "suppression" motion was admitted against him at trial. For reasons which follow, we affirm the judgment of the Court of Appeals as to Simmons, but reverse as to Garrett.

## I.

The facts as to the identification claim are these. As has been noted previously, FBI agents on the day following the robbery obtained from Andrews' sister a number of snapshots of Andrews and Simmons. There seem to have been at least six of these pictures, consisting mostly of group photographs of Andrews, Simmons, and others. Later the same day, these were shown to the five bank employees who had witnessed the robbery at their place of work, the photographs being exhibited to each employee separately. Each of the five employees identified Simmons from the photographs. At later dates, some of these witnesses were again interviewed by the FBI and shown indeterminate numbers of pictures. Again, all identified Simmons. At trial, the Government did not introduce any of the photographs, but relied upon in-court identification by the five eyewitnesses, each of whom swore that Simmons was one of the robbers.

In support of his argument, Simmons looks to last Term's "lineup" decisions—*United States* v. *Wade,* 388 U. S. 218, and *Gilbert* v. *California,* 388 U. S. 263—in which this Court first departed from the rule that the manner of an extra-judicial identification affects only the weight, not the admissibility, of identification testimony at trial. The rationale of those cases was that an

accused is entitled to counsel at any "critical stage of the prosecution," and that a post-indictment lineup is such a "critical stage." See 388 U. S., at 236–237. Simmons, however, does not contend that he was entitled to counsel at the time the pictures were shown to the witnesses. Rather, he asserts simply that in the circumstances the identification procedure was so unduly prejudicial as fatally to taint his conviction. This is a claim which must be evaluated in light of the totality of surrounding circumstances. See *Stovall* v. *Denno,* 388 U. S. 293, at 302; *Palmer* v. *Peyton,* 359 F. 2d 199. Viewed in that context, we find the claim untenable.

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.[2] The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.[3] Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actu-

---

[2] See P. Wall, Eye-Witness Identification in Criminal Cases 74–77 (1965).

[3] See *id.,* at 82–83.

ally seen, reducing the trustworthiness of subsequent lineup or courtroom identification.[4]

Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall* v. *Denno*, 388 U. S. 293, 301–302, and with decisions of other courts on the question of identification by photograph.[5]

Applying the standard to this case, we conclude that petitioner Simmons' claim on this score must fail. In the first place, it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this instance. A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to

---

[4] See *id.*, at 68–70.

[5] See, *e. g., People* v. *Evans*, 39 Cal. 2d 242, 246 P. 2d 636.

Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities. The justification for this method of procedure was hardly less compelling than that which we found to justify the "one-man lineup" in *Stovall* v. *Denno, supra.*

In the second place, there was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. Apparently, these consisted primarily of group photographs, with Simmons and Andrews each appearing several times in the series. Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.

Under these conditions, all five eyewitnesses identified Simmons as one of the robbers. None identified Andrews, who apparently was as prominent in the photographs as Simmons. These initial identifications were confirmed by all five witnesses in subsequent viewings of photographs and at trial, where each witness identified Simmons in person. Notwithstanding cross-examination, none of the witnesses displayed any doubt about their respective identifications of Simmons. Taken together, these circumstances leave little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some

respects fallen short of the ideal.[6] We hold that in the factual surroundings of this case the identification procedure used was not such as to deny Simmons due process of law or to call for reversal under our supervisory authority.

II.

It is next contended, by both petitioners, that in any event the District Court erred in refusing a defense request that the photographs shown to the witnesses prior to trial be turned over to the defense for purposes of cross-examination. This claim to production is based on 18 U. S. C. § 3500, the so-called Jencks Act. That Act, passed in response to this Court's decision in *Jencks* v. *United States,* 353 U. S. 657, provides that after a witness has testified for the Government in a federal criminal prosecution the Government must, on request of the defense, produce any "statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." For the Act's purposes, as they relate to this case, a "statement" is defined as "a written statement made by said witness and signed or otherwise adopted or approved by him . . . ."

---

[6] The reliability of the identification procedure could have been increased by allowing only one or two of the five eyewitnesses to view the pictures of Simmons. If thus identified, Simmons could later have been displayed to the other eyewitnesses in a lineup, thus permitting the photographic identification to be supplemented by a corporeal identification, which is normally more accurate. See P. Wall, Eye-Witness Identification in Criminal Cases 83 (1965); Williams, Identification Parades, [1955] Crim. L. Rev. 525, 531. Also, it probably would have been preferable for the witnesses to have been shown more than six snapshots, for those snapshots to have pictured a greater number of individuals, and for there to have been proportionally fewer pictures of Simmons. See Wall, *supra,* at 74–82; Williams, *supra,* at 530.

Written statements of this kind were taken from all five eyewitnesses by the FBI on the day of the robbery. Apparently none were taken thereafter. When these statements were produced by the Government at trial pursuant to § 3500, the defense also claimed the right to look at the photographs "under 3500." The District Judge denied these requests.

The petitioners' theory seems to be that the photographs were incorporated in the written statements of the witnesses, and that they therefore had to be produced under § 3500. The legislative history of the Jencks Act does confirm that photographs must be produced if they constitute a part of a written statement.[7] However, the record in this case does not bear out the petitioners' claim that the pictures involved here were part of the statements which were approved by the witnesses and, therefore, producible under § 3500. It appears that all such statements were made on the day of the robbery. At that time, the FBI and police had no pictures of the petitioners. The first pictures were not acquired and shown to the witnesses until the morning of the following day. Hence, they could not possibly have been a part of the statements made and approved by the witnesses the day of the robbery.

The petitioners seem also to suggest that, quite apart from § 3500, the District Court's refusal of their request for the photographs amounted to an abuse of discretion. The photographs were not referred to by the Government in its case-in-chief. They were first asked for by the defense after the direct examination of the first eye-

---

[7] In the discussion of the bill on the floor of the Senate, Senator O'Mahoney, sponsor of the bill in the Senate, stated that photographs *per se* were not required to be produced under the bill, but that "[i]f the pictures have anything to do with the statement of the witness . . . of course that would be part of it . . . ." 103 Cong. Rec. 16489.

witness, on the second day of the trial. When the defense requested the pictures, counsel for the Government noted that there were a "multitude" of pictures and stated that it might be difficult to identify those which were shown to particular witnesses. However, he indicated that the Government was willing to furnish all of the pictures, if they could be found. The District Court, referring to the fact that production of the photographs was not required under § 3500, stated that it would not stop the trial in order to have the pictures made available.

Although the pictures might have been of some assistance to the defense, and although it doubtless would have been preferable for the Government to have labeled the pictures shown to each witness and kept them available for trial,[8] we hold that in the circumstances the refusal of the District Court to order their production did not amount to an abuse of discretion, at least as to petitioner Simmons.[9] The defense surely knew that photographs had played a role in the identification process. Yet there was no attempt to have the pictures produced prior to trial pursuant to Fed. Rule Crim. Proc. 16. When production of the pictures was sought at trial, the defense did not explain why they were

---

[8] See P. Wall, Eye-Witness Identification in Criminal Cases 84 (1965); Williams, Identification Parades, [1955] Crim. L. Rev. 525, 530.

[9] Garrett was also initially identified from photographs, but at a later date than Simmons. He was identified by fewer witnesses than was Simmons, and even those witnesses had less opportunity to see him during the robbery than they did Simmons. The record is opaque as to the number and type of photographs of Garrett which were shown to these witnesses, and as to the circumstances of the showings. However, it is unnecessary to decide whether Garrett was prejudiced by the District Court's failure to order production of the pictures at trial, since we are reversing Garrett's conviction on other grounds.

needed, but simply argued that production was required under § 3500. Moreover, the strength of the eyewitness identifications of Simmons renders it highly unlikely that nonproduction of the photographs caused him any prejudice.

### III.

Finally, it is contended that it was reversible error to allow the Government to use against Garrett on the issue of guilt the testimony given by him upon his unsuccessful motion to suppress as evidence the suitcase seized from Mrs. Mahon's basement and its contents. That testimony established that Garrett was the owner of the suitcase.[10]

In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure. *Weeks* v. *United States,* 232 U. S. 383. More recently, this Court has held that "the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments . . . ." *Mapp* v. *Ohio,* 367 U. S. 643, 657.

However, we have also held that rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure. See, *e. g., Jones* v. *United States,* 362 U. S. 257, 260–261. At one time, a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor of

---

[10] Although petitioner Simmons objected at trial to the admission of Garrett's testimony, the claim was not pressed on his behalf here. Garrett did not mention Simmons in his testimony, and the District Court instructed the jury to consider the testimony only with reference to Garrett.

the seized property or that he had a possessory interest in the searched premises.[11]  In part to avoid having to resolve the issue presented by this case, we relaxed those standing requirements in two alternative ways in *Jones* v. *United States, supra*.  First, we held that when, as in *Jones,* possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the Government is precluded from denying that the defendant has the requisite possessory interest to challenge the admission of the evidence.  Second, we held alternatively that the defendant need have no possessory interest in the searched premises in order to have standing; it is sufficient that he be legitimately on those premises when the search occurs.  Throughout this case, petitioner Garrett has justifiably, and without challenge from the Government, proceeded on the assumption that the standing requirements must be satisfied.[12]  On that premise, he contends that testimony given by a defendant to meet such requirements should not be admissible against him at trial on the question of guilt or innocence.  We agree.

Under the standing rules set out in *Jones,* there will be occasions, even in prosecutions for nonpossessory offenses, when a defendant's testimony will be needed to establish standing.  This case serves as an example.

---

[11] See, *e. g., Jones* v. *United States,* 362 U. S. 257, at 262; Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 Nw. U. L. Rev. 471 (1952).

[12] It has been suggested that the adoption of a "police-deterrent" rationale for the exclusionary rule, see *Linkletter* v. *Walker,* 381 U. S. 618, logically dictates that a defendant should be able to object to the admission against him of *any* unconstitutionally seized evidence. See Comment, Standing to Object to an Unreasonable Search and Seizure, 34 U. Chi. L. Rev. 342 (1967); Note, Standing to Object to an Unlawful Search and Seizure, 1965 Wash. U. L. Q. 488. However, that argument is not advanced in this case, and we do not consider it.

Garrett evidently was not in Mrs. Mahon's house at the time his suitcase was seized from her basement. The only, or at least the most natural, way in which he could found standing to object to the admission of the suitcase was to testify that he was its owner.[13]   Thus, his testimony is to be regarded as an integral part of his Fourth Amendment exclusion claim.   Under the rule laid down by the courts below, he could give that testimony only by assuming the risk that the testimony would later be admitted against him at trial.   Testimony of this kind, which links a defendant to evidence which the Government considers important enough to seize and to seek to have admitted at trial, must often be highly prejudicial to a defendant.   This case again serves as an example, for Garrett's admitted ownership of a suitcase which only a few hours after the robbery was found to contain money wrappers taken from the victimized bank was undoubtedly a strong piece of evidence against him. Without his testimony, the Government might have found it hard to prove that he was the owner of the suitcase.[14]

The dilemma faced by defendants like Garrett is most extreme in prosecutions for possessory crimes, for then the testimony required for standing itself proves an element of the offense.   We eliminated that Hobson's choice in *Jones* v. *United States, supra,* by relaxing the standing requirements.   This Court has never considered squarely the question whether defendants charged with non-possessory crimes, like Garrett, are entitled to be re-

---

[13] The record shows that Mrs. Mahon, the owner of the premises from which the suitcase was taken, disclaimed all knowledge of its presence there and of its ownership.

[14] The Government concedes that there were no identifying marks on the outside of the suitcase. See Brief for the United States 33.

lieved of their dilemma entirely.[15]  The lower courts which have considered the matter, both before and after *Jones,* have with two exceptions agreed with the holdings of the courts below that the defendant's testimony may be admitted when, as here, the motion to suppress has failed.[16]  The reasoning of some of these courts would seem to suggest that the testimony would be admissible even if the motion to suppress had succeeded,[17] but the only court which has actually decided that question held that when the motion to suppress succeeds the testimony given in support of it is excludable as a "fruit" of the unlawful search.[18]  The rationale for admitting the testimony when the motion fails has been that the testimony is voluntarily given and relevant, and that it is therefore entitled to admission on the same basis as any other prior testimony or admission of a party.[19]

It seems obvious that a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amend-

---

[15] In *Jones,* the only reference to the subject was a statement that "[The defendant] has been faced . . . with the chance that the allegations made on the motion to suppress may be used against him at the trial, although that they may is by no means an inevitable holding . . . ."  362 U. S., at 262.

[16] See *Heller* v. *United States,* 57 F. 2d 627; *Kaiser* v. *United States,* 60 F. 2d 410; *Fowler* v. *United States,* 239 F. 2d 93; *Monroe* v. *United States,* 320 F. 2d 277; *United States* v. *Taylor,* 326 F. 2d 277; *United States* v. *Airdo,* 380 F. 2d 103; *United States* v. *Lindsly,* 7 F. 2d 247, rev'd on other grounds, 12 F. 2d 771. Contra, see *Bailey* v. *United States,* 128 U. S. App. D. C. 354, 389 F. 2d 305; *United States* v. *Lewis,* 270 F. Supp. 807, 810, n. 1 (dictum).

[17] See, *e. g., Heller* v. *United States,* 57 F. 2d 627; *Monroe* v. *United States,* 320 F. 2d 277.

[18] See *Safarik* v. *United States,* 62 F. 2d 892, rehearing denied, 63 F. 2d 369.  Accord, *Fowler* v. *United States,* 239 F. 2d 93 (dictum) ; cf. *Fabri* v. *United States,* 24 F. 2d 185.

[19] See cases cited in n. 16, *supra.*

ment claim. The likelihood of inhibition is greatest when the testimony is known to be admissible regardless of the outcome of the motion to suppress. But even in jurisdictions where the admissibility of the testimony depends upon the outcome of the motion, there will be a deterrent effect in those marginal cases in which it cannot be estimated with confidence whether the motion will succeed. Since search-and-seizure claims depend heavily upon their individual facts,[20] and since the law of search and seizure is in a state of flux,[21] the incidence of such marginal cases cannot be said to be negligible. In such circumstances, a defendant with a substantial claim for the exclusion of evidence may conclude that the admission of the evidence, together with the Government's proof linking it to him, is preferable to risking the admission of his own testimony connecting himself with the seized evidence.

The rule adopted by the courts below does not merely impose upon a defendant a condition which may deter him from asserting a Fourth Amendment objection—it imposes a condition of a kind to which this Court has always been peculiarly sensitive. For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him. Those courts which have allowed the admission of testimony given to establish standing have reasoned that there is no violation of the Fifth Amendment's Self-Incrimination Clause because the testimony was voluntary.[22] As an abstract matter, this may well be true. A defendant is "compelled" to testify in support of a motion to suppress only in the sense that if he

---

[20] See, e. g., United States v. Rabinowitz, 339 U. S. 56, 63.

[21] E. g., compare Warden v. Hayden, 387 U. S. 294, with Gouled v. United States, 255 U. S. 298; compare Camara v. Municipal Court, 387 U. S. 523, with Frank v. Maryland, 359 U. S. 360.

[22] See, e. g., Heller v. United States, 57 F. 2d 627.

refrains from testifying he will have to forgo a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit.[23] However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit.[24] When this assumption is applied to a situation in which the "benefit" to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

For the foregoing reasons, we affirm the judgment of the Court of Appeals so far as it relates to petitioner Simmons. We reverse the judgment with respect to petitioner Garrett, and as to him remand the case to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[23] For example, testimony given for his own benefit by a plaintiff in a civil suit is admissible against him in a subsequent criminal prosecution. See 4 Wigmore, Evidence § 1066 (3d ed. 1940); 8 *id.*, § 2276 (McNaughton rev. 1961).

[24] *Ibid.*

MR. JUSTICE BLACK, concurring in part and dissenting in part.

I concur in affirmance of the conviction of Simmons but dissent from reversal of Garrett's conviction. I shall first discuss Simmons' case.

1. Simmons' chief claim is that his "pretrial identification [was] so unnecessarily suggestive and conducive to irreparable mistaken identification, that he was denied due process of law." The Court rejects this contention. I agree with the Court but for quite different reasons. The Court's opinion rests on a lengthy discussion of inferences that the jury could have drawn from the evidence of identifying witnesses. A mere summary reading of the evidence as outlined by this Court shows that its discussion is concerned with the weight of the testimony given by the identifying witnesses. The weight of the evidence, however, is not a question for the Court but for the jury, and does not raise a due process issue. The due process question raised by Simmons is, and should be held to be, frivolous. The identifying witnesses were all present in the bank when it was robbed and all saw the robbers. The due process contention revolves around the circumstances under which these witnesses identified pictures of the robbers shown to them, and these circumstances are relevant only to the weight the identification was entitled to be given. The Court, however, considers Simmons' contention on the premise that a denial of due process could be found in the "totality of circumstances" of the picture identification. I do not believe the Due Process Clause or any other constitutional provision vests this Court with any such wide-ranging, uncontrollable power. A trial according to due process of law is a trial according to the "law of the land"—the law as enacted by the Constitution or the Legislative Branch of Government, and not "laws" formulated by the courts according to

the "totality of the circumstances." Simmons' due process claim here should be denied because it is frivolous.* For these reasons I vote to affirm Simmons' conviction.

2. I agree with the Court, in part for reasons it assigns, that the District Court did not commit error in declining to permit the photographs used to be turned over to the defense for purposes of cross-examination.

3. The Court makes new law in reversing Garrett's conviction on the ground that it was error to allow the Government to use against him testimony he had given upon his unsuccessful motion to suppress evidence allegedly seized in violation of the Fourth Amendment. The testimony used was Garrett's statement in the suppression hearing that he was the owner of a suitcase which contained money wrappers taken from the bank that was robbed. The Court is certainly guilty of no overstatement in saying that this "was undoubtedly a strong piece of evidence against [Garrett]." *Ante,* at 391. In fact, one might go further and say that this testimony, along with the statements of the eyewitnesses against him, showed beyond all question that Garrett was one of the bank robbers. The question then is whether the Government is barred from offering a truthful statement made by a defendant at a suppression hearing in order to prevent the defendant from winning an acquittal on the false premise that he is not the owner of the property he has already sworn that he owns. My answer to this question is "No." The Court's answer is "Yes" on the premise that "a defendant who knows that his testimony may be admissible against him at trial will some-

---

*Although Simmons' "questions presented" raise no such contention, the Court declines to use its "supervisory power" to hold Simmons' rights were violated by the identification methods. One must look to the Constitution in vain, I think, to find a "supervisory power" in this Court to reverse cases like this on such a ground.

times be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amendment claim." *Ante,* at 392–393.

For the Court, though not for me, the question seems to be whether the disadvantages associated with deterring a defendant from testifying on a motion to suppress are significant enough to offset the advantages of permitting the Government to use such testimony when relevant and probative to help convict the defendant of a crime. The Court itself concedes, however, that the deterrent effect on which it relies comes into play, at most, only in "marginal cases" in which the defendant cannot estimate whether the motion to suppress will succeed. *Ante,* at 393. The value of permitting the Government to use such testimony is, of course, so obvious that it is usually left unstated, but it should not for that reason be ignored. The standard of proof necessary to convict in a criminal case is high, and quite properly so, but for this reason highly probative evidence such as that involved here should not lightly be held inadmissible. For me the importance of bringing guilty criminals to book is a far more crucial consideration than the desirability of giving defendants every possible assistance in their attempts to invoke an evidentiary rule which itself can result in the exclusion of highly relevant evidence.

This leaves for me only the possible contention that Garrett's testimony was inadmissible under the Fifth Amendment because it was compelled. Of course, I could never accept the Court's statement that "testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit." *Ante,* at 394. No matter what Professor Wigmore may have thought about the subject, it has always been clear to me that any threat of harm or promise of benefit is sufficient to render a defendant's statement involuntary. See *Shot-*

*well Mfg. Co.* v. *United States,* 371 U. S. 341, 367 (1963) (dissenting opinion). The reason why the Fifth Amendment poses no bar to acceptance of Garrett's testimony is not, therefore, that a promise of benefit is not generally fatal. Rather, the answer is that the privilege against self-incrimination has always been considered a privilege that can be waived, and the validity of the waiver is, of course, not undermined by the inevitable fact that by testifying, a defendant can obtain the "benefit" of a chance to help his own case by the testimony he gives. When Garrett took the stand at the suppression hearing, he validly surrendered his privilege with respect to the statements he actually made at that time, and since these statements were therefore not "compelled," they could be used against him for any subsequent purpose.

The consequence of the Court's holding, it seems to me, is that defendants are encouraged to come into court, either in person or through other witnesses, and swear falsely that they do not own property, knowing at the very moment they do so that they have already sworn precisely the opposite in a prior court proceeding. This is but to permit lawless people to play ducks and drakes with the basic principles of the administration of criminal law.

There is certainly no language in the Fourth Amendment which gives support to any such device to hobble law enforcement in this country. While our Constitution does provide procedural safeguards to protect defendants from arbitrary convictions, that governmental charter holds out no promises to stultify justice by erecting barriers to the admissibility of relevant evidence voluntarily given in a court of justice. Under the first principles of ethics and morality a defendant who secures a court order by telling the truth should not be allowed to seek a court advantage later based on a premise

directly opposite to his prior solemn judicial oath. This Court should not lend the prestige of its high name to such a justice-defeating stratagem. I would affirm Garrett's conviction.

MR. JUSTICE WHITE, concurring in part and dissenting in part.

I concur in Parts I and II of the Court's opinion but dissent from the reversal of Garrett's conviction substantially for the reasons given by MR. JUSTICE BLACK in his separate opinion.