■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. KIM JOYIENS, Appellant.— Judgment of the Supreme Court, Queens County, rendered April 11, 1972, affirmed. No opinion. Latham, Acting P. J., Cohalan, Brennan and Benjamin, JJ., concur; Munder, J., dissents and votes to reverse the judgment and dismiss the indictment upon the ground that the defendant's guilt was not established beyond a reasonable doubt (CPL 470.20, subd. 5). On August 26, 1970, just before midnight, two policemen on foot patrol in Queens were fired upon by three gunmen. The two policemen, though severely wounded, returned the fire killing one of the gunmen and reportedly wounding another. On November 8, 1971, the defendant and his brother were indicted in relation to that incident, charged with attempted murder, two counts of assault in the first degree and possession of dangerous weapons as a felony. On February 14, 1972, following a *Wade* identification hearing, the defendant and his brother were tried. The jury exonerated the brother but found defendant guilty as charged. Ten months after the shootout the defendant was identified as a participant by one of the wounded patrolmen. The identification was made by the patrolman's selection of defendant's photograph from a group of 11 photographs shown to him. It was established that the photo of defendant differed from the other 10 in two respects: defendant's photo was the only one without writing on the back, and defendant's was against a blank background while the others suggested a police station. This court recently criticized a similar selection process, although the in-court identification in that case was sustained (*People* v. *Dee,* 44 A D 2d 721). Preindictment, and even pretrial identification by photograph has been recognized as a proper and effective police procedure (*Simmons* v. *United States,* 390 U. S. 377). It is not constitutionally prohibited and it has been held that even a post-indictment photographic identification is not a "critical stage" of the prosecution requiring the presence of counsel (*United States* v. *Ash,* 413 U. S. 300). The evil to be avoided in such procedure is an irreparable misidentification because of improper suggestion. "This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized" (Harlan, J., in *Simmons* v. *United States, supra,* p. 383). It is clear then, that whether a photographic identification procedure has been impermissibly suggestive must be determined on the facts of each case. Given the tainted method used to zero in on defendant, many of the facts surrounding the crime and

his apprehension take on added significance. The shooting occurred at midnight. It lasted approximately two minutes during which one police officer fired no less than 18 rounds of ammunition. The police and the gunmen never got closer to each other than 12 to 15 feet and were crouched for protection behind a brick wall approximately three and one-half to four feet high. The officer, Scarabino, who later identified defendant, testified that he had hit the defendant with one of his shots but the employment records of the American Broadcasting Company, by whom the defendant was employed, indicated that he was at work the next morning. Scarabino stated he could not see the gun being fired by the third assailant, who died at the scene, but he could only see flashes coming from his direction. Scarabino himself, was shot four times. Under these circumstances it is difficult to accept his positive identification of the defendant from a photograph 10 months later. Scarabino's testimony concerning identification was confused and inconsistent. At the pretrial *Wade* hearing, he testified he could not remember the description he gave of the assailants immediately after the shooting at the hospital emergency room. He made no notations in his memo book concerning the incident. At the trial, he could only recall telling the police who came upon the scene after the shooting to look for two male Negroes. When asked on cross-examination what he observed of defendant during the shooting, he replied " a male Negro with dark hair in an Afro style haircut ". He later explained he used the term " Afro " to differentiate from the straight hair of Caucasians. Defendant testified at the trial he never wore his hair in Afro fashion. He described his hair as straight rather than kinky. After the shooting, the description carried over the police radio of the two gunmen who fled, purportedly the defendant and his brother, was as follows: " wanted for shooting of two patrolmen. Number one, male Negro, light skin, six feet four inches, 230 lbs., 28–30 years. Number two, male Negro, dark skin, five feet seven inches, 180–190 lbs., wearing dark clothes and dark shoes ". The evidence at the trial was that defendant was six feet tall and weighed 145 pounds. His brother was six feet tall and weighed 143 pounds. Neither police description is even close. Further, the evidence was that defendant openly acknowledged his relationship with the dead gunman. He attended the funeral and delivered a eulogy. In fact, the police took his photograph at the funeral. About a month after the funeral, defendant was questioned by the F.B.I. and released. Defendant made no attempt to flee after the shooting. He kept up his steady employment with one of the country's largest broadcasting companies. He married the young woman he claimed he was with on the night of the shooting and settled down in the same neighborhood. He took the stand in his own behalf and testified to his whereabouts on the night of the shooting. His alibi was corroborated by two witnesses, including his wife. Besides the identification evidence, which, for the reasons stated, is hardly convincing, the only evidence connecting defendant with the crime was supplied by four police officers who testified in rebuttal to defendant's sister-in-law who had testified as an alibi witness. This evidence was admissible, however, solely to impeach the credibility of the alibi witness. The officers testified that defendant's sister-in-law gave a statement to the effect that defendant and his brother had arrived at her house shortly after the shooting, that defendant had a gunshot wound which was treated with the help of medical supplies provided by a friend, and that defendant stayed at the house for two days. Remarkably, this statement was never reduced to writing and apparently was obtained only *after* the sister-in-law's name had been supplied to the prosecution as an alibi witness. This evidence was in no way admissible as affirmative evidence of guilt (*People* v. *Welch,* 16 A D 2d 554,

558–559; *People* v. *Carroll,* 37 A D 2d 1015). In my view, defendant's guilt was not established beyond a reasonable doubt. I vote to reverse and dismiss the indictment.