Fred B. ALLEN, Petitioner, Appellant,

v.

Robert MOORE, Superintendent, etc.,
Respondent, Appellee.

Richard W. BALUKONIS, Petitioner,
Appellant,

v.

Daniel A. O'BRIEN, Superintendent, etc.,
Respondent, Appellee.

Nos. 71–1133, 71–1213.

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1971.

Decided Jan. 10, 1972.

Wilbur A. Hyatt, Lawrence, Mass., for Richard W. Balukonis, appellant.

Joel R. Labell, Lawrence, Mass., by appointment of the Court, for Fred Allen, appellant.

Edward W. Kirk, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Crim. Div., were on brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

Petitioners Allen and Balukonis, after being found guilty by a jury in the Massachusetts Superior Court of armed bank robbery, had their convictions affirmed on appeal. Commonwealth v. Balukonis, 1970 Mass. A.S. 1043, 260 N.E. 2d 167. A principal point raised on that appeal, and the only one advanced in their subsequent habeas petitions, was that the identifying witnesses had been so infected by improper police procedure that their testimony at the trial violated petitioners' constitutional rights. The importance of this claim is indicated by the fact that the Commonwealth's case depended solely upon identification testimony. The case was submitted on the state court transcript. The court denied the writs, but granted a certificate of probable cause to appeal to one petitioner. We thereafter granted the other, and in connection therewith requested the Commonwealth's Attorney General to show cause why we should not, hereafter, forbid the use of "all one-way glass in police stations by prospective witnesses for viewing suspects, as necessarily in contravention of constitutional rights." To this last the Attorney General has made a pro-forma reply in an appendix to respondent's brief.

The facts are these. On February 2, 1968, two men held up the Shirley (Mass.) Cooperative Bank. The process took several minutes, during which time they were observed by four tellers, Michaud, Nowokunski, Peterson and Will. Some of the tellers, in addition, had observed one of the two in the parking lot outside, before they entered. The Commonwealth produced two other identifying witnesses, Marcinkewicz, a waitress, and Adamson, a police officer. All six had identified petitioners from photographs, under allegedly suggestive conditions. The tellers had further identified them through one-way glass in informal show-ups, and there were further pre-indictment identifications, hereafter described. We are obliged to review the witnesses' pre-trial exposure in considerable detail.

We quote first from the opinion of the Supreme Judicial Court, noting, of course, that when the Court spoke of Allen and Balukonis, this meant, more exactly, persons identified by the witnesses at the trial as being these individuals.

"On February 2, 1968, there were four employees, all women, working at the bank. They are Gladys S. Will, Doris A. Nowokunski, Edith E. Peterson and Jeannine F. Michaud. Between 9:30 and 9:45 A.M. their attention was drawn to a disturbance in front of the bank building. The disturbance was caused by a pack of dogs that were creating problems with the traffic. The dogs ran toward the parking lot on the right side of the bank building. The

women moved to a window facing the bank parking lot when their attention was drawn to an automobile 'backing in towards the bank.' Three of the women saw the defendant Allen alight from the car, walk to the rear of the car, toward the bank, and then walk back to the front of the car. Shortly thereafter the defendant Balukonis entered the bank and approached Mrs. Peterson's teller's window. He asked if he could see the manager. Mrs. Peterson told 'him that the manager was out and would be back shortly.' She asked if he could be helped by anyone else but he said, 'no, he still wanted to see the manager.' Balukonis then proceeded to walk back and forth in the bank lobby. Meanwhile, the defendant Allen came into the bank and he, too, went to Mrs. Peterson's window. He asked her for change in exchange for four dollar bills that he had placed on the counter. At that time Miss Michaud was going for coffee and as she unlocked the gate which led to the area behind the counter and the vault, Balukonis pushed her back. He held a gun in his left hand and said, 'This is a holdup.' Balukonis ordered the women into the vault, pulled two paper shopping bags from under his jacket and told the women to fill the bags with the money in the vault. As these events were occurring, Allen went behind the counter and began emptying Mrs. Will's cash drawer. While in the vault Balukonis

'kept telling . . . [Allen] to hurry up and get the back door open.' Balukonis emptied one shopping bag into the other and after inquiring whether the vault could be opened from the inside, he told the women to lie down in the vault and remain there for ten minutes. Balukonis left the vault and turned the dial on the door. The women remained in the vault about five minutes and then came out. Mrs. Will immediately called the police and locked the bank's front door."

This recitation, from the standpoint of chronology, should be preceded by a further quotation from the Court's opinion.

"Jean A. Marcinkewicz, a waitress at the Shirley Restaurant . . . identified the defendants as the same two men who entered the restaurant at about 9 a. m. on the morning of the robbery and left about fifteen minutes later. She also stated that she had seen both men between 9 and 10 a. m. on several occasions prior to the date of the robbery and that on each occasion the men were together."

In addition, Adamson, a police officer, testified that he had seen the defendants together in the restaurant on the morning of the robbery.

Thereafter, the following events occurred.

On February 2, the day of the robbery, the four tellers and the waitress were shown about 400 photographs. No identification was made. On February 8, 17 photographs were shown to each of the four tellers, the waitress, and the police officer. Of these 17, 14 were from the collection shown and rejected on February 2. Of the three new photographs, two were of defendant Allen. No other individual was repeated in the photographs. All witnesses identified the photographs of Allen. That evening 15 photographs were displayed separately to each witness at his home. Of the 15, three were of defendant Balukonis. No other individual was repeated in the photographs. Nine or ten of the 15 photographs were of the same size, and one of the three photographs of defendant Balukonis was four or five times as large as the rest of the display. Each witness identified the photographs of Balukonis.

On February 13, tellers Michaud and Nowokunski were taken by the police to the Lawrence courthouse where, upon alighting from their automobile, both recognized Allen walking alone in the street. Upon entering the courthouse the two tellers again recognized Allen as he paced alone in the corridor. They were subsequently taken to a courtroom where Allen was a defendant in another proceeding. Again they identified Allen

as one of the men who robbed the bank. Later that same day tellers Michaud and Nowokunski were taken to the Lawrence police station where, through a one-way mirror, they viewed Balukonis sitting in a room at the detective bureau. Of the men in the room, only Balukonis was dressed in work clothes. Both tellers identified Balukonis as one of the robbers.

On February 15 tellers Will and Peterson were taken to Boston state police headquarters where, through a one-way mirror, they viewed Balukonis sitting with another man whom they knew to be a policeman. Both identified Balukonis as one of the robbers. On February 29 Will and Peterson were taken to Lawrence police station where they looked through another one-way mirror and viewed Allen as he sat and talked with several police officers. Both Will and Peterson identified Allen as one of the participants in the robbery.

In sum, no witness ever failed to identify Allen and Balukonis, at either the chance or the arranged meetings, and no witness ever identified anyone else. No counsel was present at any of the identifications, nor was either Allen or Balukonis aware that he was being displayed to witnesses for the purposes of identification.

At the trial the court admitted in evidence the fact that the witnesses had identified the photographs, and had identified Allen at the chance encounters at the courthouse. It excluded evidence of the identification of Allen inside the Lawrence courtroom, and of the identification of both defendants through the one-way glass. It permitted all the witnesses to identify both defendants at the trial. The defendants objected to all of this, but particularly to the in-court identifications because of the excessive previous police-directed exposure.

In affirming the judgments the Supreme Judicial Court stated that it "need not determine whether the pretrial identifications were improper, because even if we assume that they were,

we are satisfied that the in-court identifications of the defendants 'had an independent origin.' United States v. Wade, 388 U.S. 218, 242 [87 S.Ct. 1926, 18 L. Ed.2d 1149]. Each of the witnesses had ample opportunity prior to or during the robbery to observe the defendants. Their testimony warrants the conclusion that the in-court identifications were based on their observations of the defendants on February 2, 1968, the day of the robbery and not as a result of the pre-trial confrontations."

■■ In approaching this matter we bear in mind that improper police procedure not only violates fundamental personal rights, but, most important, it may lead to conviction of the innocent. See Simmons v. United States, 1968, 390 U. S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247. But at the same time, without investigatory procedures everyone may escape prosecution, the guilty as well as the innocent. The basic question should be the fairness of the procedure in terms of avoidable prejudice.

We note at the outset that too much weight must not be put upon the easy phrase, police suggestion. It may well be said that the more the testimony is the product of suggestion, the less should be its testimonial value. Yet, in a sense, what could be more suggestive than seeing the defendant in the courtroom after he has not only been suspected by the police, but indicted by a grand jury. In terms of fairness, however, there has been no abuse. Not only is counsel present, but the jury has full opportunity to view the circumstances and assess evidentiary worth. Correspondingly, at a line-up attended by counsel there is full opportunity to present the account from the defendant's standpoint for the jury's consideration. Of course, even if counsel is present, a line-up may be unnecessarily prejudicial for other reasons, just as it may when a suspect is not in custody and counsel is unavoidably absent.

■ The occurrence of unfair activities may require two judicial responses.

The fact that the witness identified the defendant on that occasion may not be admitted into evidence. Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. Or the occurrence may be used to diminish the value, or altogether to prevent the introduction of other evidence. A witness may be so exposed to improper procedure that a later courtroom identification by him may be regarded as worthless. United States v. Wade, ante. *See also* Cefalo v. Fitzpatrick, 1 Cir., 1970, 434 F.2d 187; United States v. McNamara, 1 Cir., 1970, 422 F.2d 499, cert. denied 397 U.S. 1056, 90 S.Ct. 1403, 25 L.Ed.2d 674. This result may be thought a prophylactic rule—a sanction to discourage such pre-trial conduct by the police; or it may be simply a recognition that the witness has been so contaminated in fact that it is unwarrantably difficult to determine the true value of his testimony.

 There are circumstances when evidentiary screening is necessary to accomplish a legitimate purpose. Here there is no excuse for having created the occasion. It was because of this that we requested the Attorney General to show cause why one-way glass, as an unconstitutional means for viewing suspects, should not be eliminated from police stations. His reply that we have no power to order such removal is obviously correct. However, we have power to determine the effect of unconstitutional conduct. A one-way glass viewing in a police station of which the suspect is ignorant is such a flagrant constitutional violation that no prosecutor should be surprised if, faced with such a viewing occurring after the date of this opinion, we conclude that the fact that it was thought necessary was a conclusive admission that the witness required unconstitutional assistance. It is not unrea-

sonable to find that deliberately unlawful conduct is not engaged in unless productive and needed. *Cf.* United States v. Flannery, 1 Cir., 1971, 451 F.2d 880 (grossly improper jury argument). When unlawful police behavior, persisted in despite repeated court objections, substantially burdens the court, as well as unnecessarily risks prejudicing the defendant, the only way to put an end to particularly flagrant forms may be to rule that the witness is per se disqualified.[1]

 In the case at bar the witnesses' exposure to the defendants subsequent to the crime fell into three categories; photographic identifications; chance meetings, and arranged viewings. No problem results from the chance meetings. These were neither avoidable, unfair, nor suggestive. Spontaneous identifications under such conditions might be said to emphasize the witness' reliability, rather than the reverse. In any event, they were not detrimental, and the admission of evidence of these occurrences was not error. United States v. Seader, 5 Cir., 1971, 440 F.2d 488, 496. As to the balance, any display believed by the witness to be intentional must, to an extent, be suggestive.[2] While the photographic displays here were somewhat more suggestive than necessary, we do not find them so seriously suggestive as to render testimony of the identifications inadmissible. We turn, therefore, to the question whether the witnesses had been so exposed, overall, to improper suggestive procedures that in-court identification by them should not have been permitted.

 When an in-court identification is preceded by improper suggestions, whether line-ups or photographic identifications, the admissibility of the

---

1. By this we are not condemning one-way-glass line-ups where the defendant has counsel present. *See* How Sound is Your Police Lineup? FBI Law Enforcement Bulletin, Vol. 40, No. 12, pp. 2, 25 (Dec. 1971).

2. How we would feel about a meeting that seemed accidental and unsuggestive to the witness, but was in fact arranged, we need not determine. In Cefalo v. Fitzpatrick, 1 Cir., 1970, 434 F.2d 187, we found it unnecessary to decide because on the facts of that case we found the error, if any, to have been harmless.

in-court identification is based on a consideration of factors and policies outlined in the *Wade* and *Simmons* quartet. United States v. Wade, ante; Gilbert v. California, ante; Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Simmons v. United States, ante. Although the question may arise in various contexts, in weighing improper suggestion the test should be the same—was it "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, ante, 390 U.S. at 384, 88 S.Ct. at 971. In making this determination the court should consider the factors enumerated in United States v. Wade, ante, 388 U.S. at 241, 87 S.Ct. 1926. *Simmons* involved photographs, and *Wade* an uncounseled line-up, but response to suggestion is not measured in terms of the improper absence of the defendant's counsel. *Wade* listed six inquiries. (1) The extent of the witness' opportunity to observe the defendant at the time of the crime; prior errors, if any, (2) in description, (3) in identifying another person or (4) in failing to identify the defendant; (5) the receipt of other suggestions, and (6) the lapse of time between the crime and the identification. The first factor seems the most important. Clearly the firmer the contemporaneous impression, the less is the witness subject to be influenced by subsequent events.

In the case at bar all of the *Wade* tests were met, and exceptionally well met, other than the fifth. Each witness had an opportunity to observe the robbers at close range, under good lighting conditions, over a period of several minutes; in the case of the tellers, at the bank; in the case of the other two witnesses, outside. No significant differences existed between their pre-line-up descriptions and the defendants' actual description. The witnesses never made a mistake, either by identifying someone else, or by failing to identify the defendants. Finally, all line-ups occurred within a month of the robbery. Although, as previously detailed, the police procedure here was particularly improper, considering the circumstances as a whole in the light of the *Wade* factors, we find adequate grounds to conclude that the in-court identifications of both defendants were independent of the improper procedures. *See* United States v. Butler, 1 Cir., 1970, 426 F.2d 1275; s.c. after remand, 434 F.2d 243, cert. denied 401 U.S. 978, 91 S.Ct. 1207, 28 L.Ed.2d 328. Whether we will do so again in like circumstances, after the warnings given in this opinion, is another question.

Affirmed.