William E. ROYCE, Petitioner-Appellant,

v.

Robert J. MOORE, Superintendent, Respondent-Appellee.

No. 72-1087.

United States Court of Appeals, First Circuit.

Argued Sept. 8, 1972.

Decided Nov. 22, 1972.

Robert F. Corliss, Boston, Mass., by appointment of Court, for appellant.

Harvey F. Rowe, Jr., Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., John J. Irwin, Jr., Asst. Atty. Gen., Chief, Crim. Div., and David A. Mills, Asst. Atty. Gen., Chief, Appellate Section, were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and HAMLEY,* Circuit Judges.

HAMLEY, Circuit Judge.

William E. Royce, in custody in a Massachusetts penal institution under three consecutive sentences following separate convictions for bank robbery, escape and bank robbery, appeals from a district court order denying his application for a writ of habeas corpus addressed to his second bank robbery conviction. Royce's argument in this court centers around his contention that the testimony of the only witness who identified him at this state bank robbery trial as one of the robbers was unconstitutionally tainted by a show-up prior to the trial at which Royce was not represented by counsel, and which was impermissibly suggestive. For the reasons stated below we affirm.

The bank robbery in question occurred on August 30, 1968, and involved the Brigham's Circle office of the Charlestown Savings Bank, Boston, Massachusetts. During the late afternoon of that day two men, one rather small and one rather large, entered that bank, exhibiting guns, and conducted the robbery.

* Of the Ninth Circuit, sitting by designation.

The larger man, who was later identified as Royce, stationed himself near the front door, while the smaller man went from teller to teller collecting the money.

There were many eyewitnesses in the bank at the time. Among these, the acting bank manager, three tellers, and bank guard Thomas Ahearn, testified at the trial. Only Ahearn identified Royce as one of the robbers, although the other witnesses testified that the larger robber was about the height and weight of the man who was identified in court as Royce. At the time of the robbery, Ahearn, who was then sixty-eight or sixty-nine years old, and wore glasses, was stationed in his office at the back of the room. His office was equipped with a one-way glass which enabled him to see into the bank without being seen. The robber standing by the front door was about twenty-five feet away from Ahearn.

Both robbers were wearing false beards while they were in the bank. But Ahearn testified that the larger man's beard slipped down five or six inches three or four times, enabling Ahearn to see the robber's face. Ahearn testified that the robbers were in the bank seven or eight minutes and that he watched the large man about five or six minutes. Ahearn also testified that when the robbers left the bank, he saw the larger man on the street for about one minute from a distance of about twenty feet, after which Ahearn went back into the bank through the rear door.

A week after the robbery Ahearn was shown, at the bank, seventy-five to one hundred photographs from police files. No one was with Ahearn when he looked them over and selected one photograph as that of the larger of the two robbers. At the state trial Ahearn testified that he recognized Royce as the larger robber he observed in the bank and as the man shown in the photograph he had selected.

On May 5, 1969, which was more than eight months after the robbery, the police took Ahearn to the Superior Court for Plymouth County, Massachusetts, to view Royce for identification purposes. Royce was there for sentencing in connection with another bank robbery. Ahearn sat in the front row and, for some time, watched Royce, who was in shackles, and two other defendants in that case. At the noon recess he told the detective who had taken him to this court room that Royce was one of the Charlestown Savings Bank robbers.

There was an extensive voir dire inquiry at the state trial, in the absence of the jury, as to whether these photographic and show-up identification procedures had unconstitutionally tainted Ahearn's proposed trial testimony identifying Royce as one of the bank robbers. The trial court ruled that such identification testimony might be presented to the jury, and it was. Following Royce's conviction, he appealed to the Supreme Judicial Court of Massachusetts, arguing that the trial court erred in permitting Ahearn to identify Royce at the trial. However, the conviction was affirmed, the court holding that even assuming the show-up at the Plymouth court was improper, Ahearn's identification testimony was not tainted thereby since it was based upon an independent source, namely Ahearn's observations inside and outside the Charlestown Savings Bank. Commonwealth v. Royce, 266 N.E.2d 308 (Mass.1971).

Royce then commenced this habeas corpus proceeding. The federal district court referred the matter to a Magistrate to serve as a Special Master, and counsel was appointed to represent Royce. A hearing was held on January 10, 1972, which was more than three years and four months after the robbery. Counsel for Royce called three witnesses at this hearing, including Ahearn, and respondent warden presented no testimony except to recall Ahearn briefly to the witness stand.

The next day the Special Master filed a twelve-page report summarizing the evidence he had received, pointing out

inconsistencies between Ahearn's identification testimony at the trial and his testimony before the Special Master,[1] expressing doubt as to Ahearn's opportunity to identify Royce at the bank in view of Ahearn's testimony before the Special Master, and expressing the view that the confrontation at the Plymouth court had not been adequately explored, but that it appeared to be extremely suggestive. The Special Master recommended that, in view of Ahearn's inconsistent testimony, "and new developments which apparently were not explored by counsel at the State Court level,"[2] the state court should "be given the opportunity to reconsider the whole matter. . . ."[3]

When the Special Master's report came before the district court, on January 18, 1972, counsel for Royce asked that his client be permitted to testify because of the Special Master's observations quoted in footnote 3 herein.

Royce then testified, but no other testimony was received on that day. The matter again came before the district court on February 8, 1972. At that time the district court announced that the court had "the transcript of the testimony which was given before Magistrate Davis." The court stated that, in the absence of objection, the court "assumed that the parties agreed that that record [should] be treated by the Court as though it were a deposition or as though it were a report of evidence taken by a Master or otherwise was available to the Court as part of the record in this case." Counsel for both parties indicated that the court's understanding was correct.[4]

The district court inquired whether either party desired to have further testimony from Ahearn. Counsel for the warden asked that Ahearn testify, and he did so. In the course of this testimony, Ahearn attributed the inconsisten-

---

1. At the trial Ahearn had testified that he had watched the larger robber about five or six minutes. Before the Special Master he testified that the robbers were in the bank "probably a minute or a minute and a half." At the trial, Ahearn testified that the false beard slipped off of the larger robber's face about three or four times. Before the Special Master, Ahearn testified that the beard dropped off once but the robber immediately pushed it back up. At the trial Ahearn testified that he saw the larger robber on Tremont Street probably about one minute. Before the Special Master he gave this time as "[a] matter of seconds." At the trial, Ahearn testified that he did not see the robbers get into an automobile. Before the Special Master he said the robbers got into a red Chevrolet and drove up Tremont Street, the smaller robber at the wheel. At the trial, Ahearn testified that he reëntered the bank through a rear door. Before the Special Master, he testified that he returned through the front entrance.

2. The Special Master explained this observation later in his report by stating that he was particularly concerned that counsel did not develop fully (presumably at the trial) the attendant circumstances surrounding the confrontation at the Plymouth Superior Court. The transcript of the state trial, which is before us, indicates that the Plymouth court episode was explored to some extent on both the direct and cross-examination of Ahearn on voir dire. It is understandable why counsel for Royce did not explore, before the jury, Ahearn's presence in the Plymouth court while Royce, in shackles, was being sentenced for another bank robbery.

3. In the course of his report, the Special Master also said:
   "Royce did not take the stand before me, therefore, my findings and opinion are necessarily based on the testimony of others. This is not a case where Royce could not have been called because of the privilege against self-incrimination. His failure to take the stand in this proceeding permits me to draw reasonable inferences."

4. Royce points out in this court that the court must have been speaking of the prospective availability of the transcript of the proceedings before the Special Master. This transcript apparently was not completed until March 16, 1972, and was not filed until March 23, 1972. The district court rendered its decision on March 2, 1972, thus apparently not awaiting availability of this transcript. However, the Special Master's report contains a very complete summary of the evidence taken at that hearing and Royce voices no objection to that summary.

cies between his trial testimony and that given before the Special Master to the lapse of time between the two hearings and the resulting failure of recollection at the Special Master's hearing. Ahearn then testified that he observed the larger robber in the bank for five or six minutes. He again identified Royce as that person, stating that he did not need to go to the Plymouth court to reinforce his identification of Royce because there had never been any doubt in his mind.

Following this hearing, the district court denied the application for a writ of habeas corpus. Stating that it had held a *de novo* hearing, the court found that Ahearn had a recollection of the events and the participation of Royce in the robbery wholly independent of the Plymouth court show-up. The court further found that at the time of the robbery, Ahearn had adequate opportunity to observe Royce inside and outside the bank.

On this appeal Royce does not question the propriety of the photographic identification procedure used by the police with respect to Ahearn. Nor is there here any dispute by the warden concerning Royce's contention that the show-up at the Plymouth court was illegal. At the hearing before the Special Master, counsel for the warden conceded that this confrontation was illegal, and

he makes no attempt to defend it in this court.[5]

The prime question presented here is whether, under all the circumstances, the concededly improper show-up gave rise to a substantial likelihood of misidentification by Ahearn. *See* Allen v. Moore, 453 F.2d 970, 975 (1st Cir. 1972). The principles to be applied in determining such a question, and a reference to the leading case authority on the point, are set out in *Allen*, 453 F.2d at 975, and need not be repeated here.

We agree with the Massachusetts Supreme Judicial Court that under the evidence presented at the trial, Ahearn's testimony identifying Royce rested on sources wholly independent of the Plymouth court incident, and therefore was not tainted by that confrontation. Considering the available time for observation, distances, illumination, absence of obstructions, and Ahearn's fifteen years experience as a guard, all as testified to at the trial, Ahearn was in a position to provide reliable identification testimony. While others in the bank at the time were not able to identify Royce, this may reasonably be attributed to their nervousness and lack of experience in identifying individuals. Some of these others, however, did corroborate Ahearn's trial testimony as to the size of the larger robber and the time available for observation.

---

5. Contrary to Royce's contention, this show-up was not illegal because Royce was not there afforded the opportunity to be represented by counsel. The show-up took place in May, 1969. The indictment was returned on October 15, 1969. The right to counsel does not extend to pre-indictment show-ups. Kirby v. Illinois, 406 U.S. 682, 690, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

But Royce also invokes the principle that even under circumstances where the Sixth Amendment right to counsel would not render a police line-up or one-man show-up improper, the confrontation may be so impermissibly suggestive and conducive to irreparable mistaken identification as to deny the accused due process of law under the Fifth or Fourteenth Amendments. Appraisal of such a contention calls for a review of the "totality

of the circumstances" under which the line-up or show-up occurred. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *See* Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The parties are apparently in agreement that, under this test, the one-man show-up at Plymouth was impermissibly suggestive.

Royce points out that the state trial court held otherwise, stating that there "was nothing unduly suggestive in respect of that. . . . " However, as noted above, the state trial conviction was not affirmed upon that ground, but because, in the view of the Supreme Judicial Court of Massachusetts, assuming the impropriety of that confrontation, Ahearn's trial testimony was not tainted by it but rested upon an independent source.

Of equal significance in showing that Ahearn had a basis for the in-court identification which was independent of the show-up is Ahearn's ability to select within a week after the robbery and unassisted by others, a photograph of Royce from among seventy-five to one hundred police photographs. At no time did he identify another person as the larger robber or fail to identify Royce when he had the opportunity to do so.

 It is true that in the hearing before the Special Master Ahearn gave testimony which, in several respects, was inconsistent with his trial testimony.[6] But we think the district court could reasonably discount the significance of these inconsistencies, having in view the fact that this hearing was twenty-one months after the trial and more than three years and four months after the robbery. In his subsequent testimony before the district court Ahearn substantially returned to his state trial version, blaming the inconsistencies upon the passage of time. Absent unusual circumstances not present here, it was not unreasonable for the district court to find that Ahearn's trial testimony concerning the robbery was likely to be more reliable than his testimony before the Special Master one year and nine months later.

Royce asserts that the district court reversed the findings of fact of the Special Master without sufficient cause. In fact, however, on the critical questions of whether Ahearn had an adequate opportunity to observe the robbers at the time of the robbery, and whether the Plymouth court incident tainted Ahearn's identification testimony, the Special Master, while expressing some misgivings, made no findings. He merely recommended that the state court reconsider the matter. But the Supreme Judicial Court of Massachusetts had considered that very question and had ruled against Royce. Moreover, our review of all the proceedings in the district court convinces us that the high Massachusetts court would not reverse its ruling if it had this record before it. Indeed, Royce does not, on this appeal, advocate adoption of the Special Master's recommendation that the state be given an opportunity to reconsider the conviction.

While Royce now objects to the district court considering the proceedings before it a hearing *de novo*, we think, in light of the lack of findings by the Special Master as to the critical issues, that it is immaterial how the district court characterized those proceedings. Royce's counsel asked that Royce be called as a witness before the district court and did not object when the warden called Ahearn as a witness. Under all the circumstances we believe the district court proceeded properly and did not err.

Affirmed.