John J. MARTIN, Petitioner,

v.

Robert DONNELLY, Superintendent,
MCI, Walpole, Respondent.

Joseph G. BOUCHARD, Petitioner,

v.

Robert DONNELLY, Superintendent,
MCI, Walpole, Respondent.

Nos. MC 72-123-M, MC 72-124-M.

United States District Court,
D. Mass.

Dec. 6, 1974.

Kay H. Hodge, Robert V. Greco, Mass. Defenders Committee, Boston, Mass., for petitioners.

Harvey F. Rowe, Jr., Asst. Atty. Gen., Com. of Mass., Boston, Mass., for respondent.

MEMORANDUM

FRANK J. MURRAY, District Judge.

These petitions for habeas corpus present the principal question whether the constitutionally erroneous admission in evidence at a state criminal trial of out-of-court identifications which occurred in the absence of counsel subsequent to the decisions in Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), was harmless error beyond a reasonable doubt.[1] An additional question raised by petitioner Bouchard is whether the admission in evidence against him of an automatic pistol violated his Fourth Amendment rights made applicable to the states under the Fourteenth Amendment. Two distinguished Massachusetts courts, the Superior Court and the Supreme Judicial Court, have ruled that if the identification testimony did not meet the federal constitutional test of admissibility, the admission was harmless beyond a reasonable doubt. Commonwealth v. Martin et al, —— Mass. ——, 285 N.E.2d 124 (1972); see also Amplification of Findings of Fact Concerning Pre-Trial and In-Court Identifications, filed with the state court record. These courts also ruled that the automatic pistol taken from Bouchard when arrested without a warrant was properly received in evidence over his objection that its admission violated his Fourteenth Amendment rights.

Petitioners are serving sentences in Massachusetts Correctional Institution (MCI) at Walpole following a jury trial and convictions of armed robbery in the Superior Court. Their convictions were affirmed by the Supreme Judicial Court. These petitions were presented on the state court record consisting of six volumes of testimony, a digest of the testimony supplied by the petitioners, the amplified findings of the trial judge, an agreed statement of facts and memoranda of law filed by the parties. The amplified findings of the trial judge were submitted by him to the Supreme Judicial Court after the case was remanded to him for further findings.

I

*The robbery and afterwards*

The circumstances of the robbery were not challenged here, and as shown in the state court record are not complicated. At approximately 3:00 p. m. on October 4, 1968 two unmasked men, one armed with a shotgun and the other with a handgun, entered the premises of the Granite Cooperative Bank (Bank), Hancock Street, Quincy. One of the robbers remained in the area of the Bank between the entrance door and the counter,[2] and the other went behind the counter and scooped up money which was taken when they left. After the robbers fled the Bank, they crossed Hancock Street. When the robbers first entered the Bank from Hancock Street, Salvatore Rae, a customer of the Bank, was standing at the front of the counter

---

1. Petitioners also claim that the Commonwealth failed to sustain the burden of proving that the in-court identifications of the witnesses Sheila Allen, Mary Holmes, Margaret Munnis and Salvatore Rae had an independent source in the observations made during the robbery free of the taint of the improper Quincy Court confrontation, Cooper v. Picard, 428 F.2d 1351, 1353–54 (1st Cir. 1970), and were therefore improperly admitted in evidence. Except for the in-court identification of Margaret Munnis as to petitioner Bouchard, the court concludes that the state court record considered as a whole supported the factual determination of the trial judge. In view of the disposition of these petitions, the court finds it unnecessary to further consider this claim.

2. The Bank space was divided by a counter which was parallel to Hancock Street. Between the entrance door from the street and the counter the area measured approximately twenty feet wide and sixteen and a half feet deep. The counter stood about four feet above the floor. The open area behind the counter was approximately twenty feet wide and twenty feet deep. There were three teller's cages at the counter. One or more offices were located at the rear of the open space behind the counter.

at a teller's cage; Sheila Allen, a Bank teller, was behind the counter at the same cage; Julia Mulvoy, assistant treasurer of the Bank, was standing behind the counter to the right of Sheila Allen, and using the check register machine; Mary Holmes, treasurer and manager of the Bank, was walking in the area behind the counter from her office at the rear of the Bank toward the front; Gloria Spacone, a Bank teller, was at the safe located along the left wall of the Bank as viewed from the Hancock Street entrance door. In the same building, in rooms adjoining the Bank and separated from the Bank by a glass partition, were the offices of Dunkin Donuts. Margaret Munnis, employed by Dunkin Donuts as switchboard operator/receptionist, was at the switchboard and engaged in talking to F. Garrett McSweeney, an employee of the telephone company. All of these persons claimed to have observed one or both robbers during the robbery.

The robbery took but a very short time. Between 3:15 p. m. and 3:30 p. m., Officers McLean and Miller of the Quincy Police arrived in response to a telephone call made from the Bank after the robbers departed. One officer, or the other, interviewed Mr. Rae, Miss Allen, Mrs. Mulvoy, and Mrs. Holmes. Gloria Spacone was present but not interviewed. Later Officer McLean interviewed Mrs. Munnis. On October 7, Officer McLean returned to the Bank and displayed eight or nine photographs to Miss Allen, Mrs. Mulvoy, and Mrs. Holmes about the same time, and each after looking at the photographs passed

them on to another. They were where each could see another's selection. He also displayed the photographs to Mrs. Spacone, and later to Mrs. Munnis. Martin's photograph was among those displayed; Bouchard's photograph was not.[3] On October 14 Officer McLean accompanied Sheila Allen to Boston Police Headquarters, where she viewed petitioners through a one-way glass.[4] On October 15 Officer McLean arranged with Miss Allen, Mrs. Holmes, Mrs. Munnis and Mr. Rae to be present at the Quincy District Court, where they viewed the petitioners without the knowledge of petitioners or their counsel.

## II

### The evidence

At the trial the court admitted in evidence the testimony of the four witnesses (Allen, Holmes, Munnis and Rae) that they had identified petitioners at the Quincy District Court, and permitted all four witnesses to give in-court identification of petitioners. In addition, there were in-court identifications of both petitioners by Gloria Spacone, of petitioner Martin by Julia Mulvoy, and of petitioner Bouchard by McSweeney. Alibi testimony on behalf of Martin was introduced by two witnesses called by him. Three schoolgirls, who were together on Hancock Street opposite the Bank on the afternoon of the robbery, testified to seeing two men cross Hancock Street from a point near the Bank, rush past them and enter a light-colored car or white Ford parked about a block away.[5] There was testimony from

---

3. Miss Allen, Mrs. Holmes, Mrs. Mulvoy and Mrs. Munnis each picked out Martin's photograph as one of the robbers. Mrs. Spacone picked out two photographs as those of the robbers: Martin's and another. At the trial Mrs. Spacone identified the same two photographs. She testified at the trial that these two photographs were of the two robbers, and also photographs of the petitioners. Police Officer McLean admitted that Bouchard's photograph was not among those shown to any bank employee. Obviously, Mrs. Spacone was in error in her identifica-

tion of one of the photographs being that of Bouchard.

4. The showup at Boston Police Headquarters which Sheila Allen viewed through a one-way glass occurred before the opinion in Allen v. Moore, 453 F.2d 970 (1st Cir. 1972) was published.

5. The jury could have found that the three schoolgirls saw the robbers after they fled the Bank. Each of them saw two men run across Hancock Street about the time of the robbery. From their testimony the jury

Frances Ridge that she was on Hancock Street about 3:15 p. m. on the day of the robbery, that her attention was called to a white Ford which pushed her car out into the middle of the street, and that she got a good look at the two persons in the car. There was also testimony from a police officer experienced in taking fingerprints that an examination was made of the entrance door and counter for fingerprints, that certain impressions were "lifted", and that the impressions were discarded after they were examined.

### III

### *The arrest of Bouchard*

Bouchard was arrested without a warrant on Isabella Street, Boston, by a Boston police officer on the morning of October 14, 1968. He was searched and a .32 Berretta automatic was removed from his pants pocket. The gun was admitted in evidence over his objection after the trial judge refused to suppress the gun as evidence on Bouchard's motion based on the claim that no probable cause existed to arrest him. The record on which the Commonwealth relied to prove probable cause for the arrest consists of the testimony of three officers given at the hearing on the motion to suppress the gun (*see* Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)), and the agreed facts. It is the duty of this court "to apply the applicable federal law to the state court [record] independently. The state conclusions of law may not be given binding weight on habeas". Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963).

Three Boston police officers were directed to 28 Isabella Street by information given one of them on the morning of the arrest by an anonymous informant unknown to them that Martin, Bouchard and a third man were living together in an apartment in the building, and that Martin and Bouchard had been "involved in armed robberies". The informant was shown photograph files of the Boston police, and from them picked out photographs of three men said by him to be living together. The Boston police files disclosed a teletype message that a warrant had issued to the Quincy police for the arrest of Martin for armed robbery with an unnamed man five feet five, thin build and dark complexion. None of the police officers knew Martin or Bouchard or the third man. At the 28 Isabella Street apartment house, Martin was arrested on a common stairway. Bouchard was not with Martin and not in the building. As Martin was being led from the building the arresting officer saw a man, whose photograph was picked out by the informant, walking down Isabella Street. It was Bouchard. The officer, having no other information as to Bouchard's alleged criminal activity, arrested him for armed robbery.

The Commonwealth contends that the seizure of the gun from Bouchard followed a search incident to an arrest on probable cause. There can be no question that the informer's tip is fundamental to the probable cause issue. Without the tip, the police had nothing that would support a reasonable belief that Bouchard had been involved in an armed robbery. The tip therefore must be examined in the light of probable cause standards in order that its probative value can be ascertained, and the determination then made whether the tip under applicable federal law provided the police with reliable underlying circumstances necessary to establish probable cause. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Jones v. United States, 362 U.S. 257, 80

could have found that one man was taller than the other; that one of the men had a gun "about this big", and the other carried a green metal box; that the men passed within five feet of the girls; that the men ran to a white Ford and drove off. The girls realized a bank robbery had occurred, and they returned and gave a description of the men to the police. Each girl testified that she did not recognize either petitioner.

S.Ct. 725, 4 L.Ed.2d 697 (1960); *cf.* Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

The Commonwealth did not attempt to support the reliability of the unknown informer, and there were no underlying circumstances in evidence to provide a basis for crediting the informer's hearsay. He had never given other information to them or to other police officers at any time. There was no evidence that his reliability as an informer had ever been tested. Unlike Jones v. United States, *supra,* there were no circumstances shown to enable the police or the trial judge independently to assess the credibility of the informer's hearsay as to Bouchard. The informer did not relate the source of his information. There was no evidence that he obtained the information from either Martin or Bouchard, or that he or another had observed either of them in the perpetration of a robbery. Unlike United States v. Harris, *supra,* there were no statements of the informer that could be found to be "against [his] penal interest" for being involved with either Martin or Bouchard in any robbery, or sharing in the fruits of any crime. Nothing the informant told the police furnished the basis for any reason to believe his information derived from personal observations, or that it related to recent criminal activity. No description of Bouchard was given the police by the informer; he merely picked out the photograph. There was no evidence to show why Bouchard's photograph was in the police files, but clearly its presence there had no connection with the Quincy bank robbery; and even if it be considered a suspicious circumstance it cannot add substance to the probative value of the tip. Nothing was said by Martin or Bouchard before Bouchard was arrested. The police had no information from observation or another source independently of the tip that tended to corroborate the informer's claim that Martin and Bouchard were living together. There was nothing that Bouchard did prior to his arrest that made him appear suspicious. The arrest was made on a city street at a time when there was no evidence of criminal activity, and where the police had no reason to believe from any information they had that criminal activity would likely be taking place.

In United States v. Ventresca, 380 U. S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), the Court pointed out that the "Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract". Applying this approach to the present case, the informer's tip as to Bouchard, considered apart from any other information the police had, could not reasonably be credited as establishing probable cause by a neutral and detached magistrate having regard for the protections of the Fourth Amendment. It clearly does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Bouchard had been engaged in the Quincy bank robbery, or any other robbery. The tip here does not even rise to the level of specific affirmation of suspicion and belief (the character of the affidavit held insufficient in Aguilar v. Texas, *supra*) and was obviously lacking in the significant factors of personal and recent observations and involvement in criminal activity, as in the affidavit in United States v. Harris, *supra.* The affidavit in Jones v. United States, *supra,* also purported to relate personal observation and involvement of the informer, with the additional averment that the informer had previously given correct information. Thus the tip in the present case, in all its details considered singly or in the aggregate, falls short of the standards set forth and emphasized by the Court in *Jones, Aguilar* and *Harris.*

The only detail of the tip corroborated by the police was that they saw the man whose photograph the informer had picked out. The arresting officer concluded Bouchard was the man in the

photograph, and on that basis arrested him. There was no reliance upon the description in the teletype of the un-named man before the arrest. The police must have recognized that the mea-ger details of description of the un-named man in the teletype would fit an indefinite number of ordinary looking males. If the teletype description was considered at all by the police after the photographs were fed to them by the in-former, it was following the arrest of Bouchard, and not before. It was the photographic corroboration that im-pressed the police with the informer's reliability.

There was no corroboration by any in-dependent police investigation of Bou-chard being associated with Martin, for whom the warrant had issued, at 28 Isa-bella Street or elsewhere. Such an in-ference cannot be made on the record of the case. There was no evidence what-soever that Bouchard was expecting the police. The police could not have rea-sonably believed that Bouchard had fled from the apartment house upon their ar-rival, because at that time the house was surrounded by other officers to prevent any such flight and an escape therefrom by Bouchard would have been observed. The police found nothing in Apartment 4A, which they searched, that linked Bouchard to Martin. There was nothing done or said by Bouchard on Isabella Street to focus the attention of the po-lice upon him, or to warrant further ob-servation of him or investigation. No inference of his association with Martin could be made from his presence on the street. Except for the tip (including the photograph) the police had no rea-son to stop Bouchard and arrest him.

A magistrate, when confronted with the tip and corroboration in the present case, could not reasonably infer that the informer had acquired his information against Bouchard in a reliable way. Jones v. United States, *supra*; United States v. Harris, *supra*. The photo-graphic corroboration cannot by itself be found to support both the inference that the informer was reliable and trustwor-thy, and that he had made his accusation as to Bouchard's criminal activity on the basis of information obtained in a relia-ble manner. Both the tip and the photo-graphic corroboration are lacking in the details found sufficient in Draper v. United States, *supra*, and McCray v. Illi-nois, *supra*, where in each case the po-lice worked with an informer, whose re-liability for accurate information had been previously tested, and their inde-pendent police work substantially cor-roborated in several details information of criminal activity supplied by the in-former.

In the present case the in-former's tip, even when corroborated to the extent indicated, was not sufficient to provide the basis for a finding of probable cause. In reaching this conclu-sion, recognition is given to the estab-lished holdings that only the probability of criminal activity is the standard of probable cause, not a prima facie show-ing. It is clear upon the state court rec-ord that when the constitutional chal-lenge to the arrest was made at the trial, there was nothing more specific that could be shown than appears as to the quantum of information supplied by the informer and the reasons why the police thought the informer reliable. There was no demonstration that at the time of arrest the officer believed that Bouchard had been involved in the Quin-cy bank robbery; but aside from that, the information the police had and the common-sense inferences to be drawn therefrom cannot support the validity of the arrest on constitutional grounds. A police officer does not have probable cause to make an arrest without a war-rant when the only information he has about the commission of a crime and the person who may have committed it is an unsupported and uncorroborated tip from an unknown and unnamed inform-er.

It follows that the search of Bouchard was not incidental to a valid arrest, and the .32 Berretta was admitted in evi-dence in violation of his rights under the Fourth Amendment made applicable

to the states through the Fourteenth Amendment. *See* Traub v. Connecticut, 374 U.S. 493, 83 S.Ct. 1899, 10 L.Ed. 1048 (1963); Ker v. California, 374 U. S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *cf.* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## IV

### *The identification procedures*

United States v. Wade, *supra*, and Gilbert v. California, *surpa*, were decided prior to the robbery, and therefore were applicable to the identification procedures. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The Quincy District Court identifications by the four witnesses (Allen, Holmes, Rae and Munnis) occurred during the arraignment of petitioners on the robbery charge. Although petitioners were then represented by counsel, neither petitioners nor their counsel were aware that the witnesses were present or that the witnesses were engaged in the process of identification at the request of the police. Insofar as petitioners and their counsel were concerned with the arraignment (the only purpose for which they were present in the courtroom) the identification proceedings of the four witnesses were conducted by the police in secret.

The issue in *Wade* was " . . . whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice", 388 U.S. at 227, 87 S.Ct. at 1932. The Court described lineups and showings as "either form of confrontation", *id.* at 229, 87 S.Ct. 1926, and emphasized the problems in "depicting what transpires at lineups and other forms of identification confrontations". *Id.* at 230, 87 S.Ct. at 1934. In discussing the problems, it referred to "suggestive influences in the secrecy of the confrontation", *id.* at 234–35, 87 S.Ct. at 1936. The Court pointed out that "in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial". (Footnotes omitted.) *Id.* at 226, 87 S.Ct. at 1932. The concern of the Court was the difficulty at the trial of showing what took place at the confrontation, for "the defense can seldom reconstruct the manner and mode of lineup identification for judge or jury . . . ", *id.* at 230, 87 S.Ct. at 1934, and "the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification". *Id.* at 231–32, 87 S.Ct. at 1934. The Court concluded that the lineup is a critical stage of the prosecution "[s]ince it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial . . . ." *Id.* at 236–37, 87 S.Ct. at 1937.

There can be no doubt that adversary judicial proceedings had begun against petitioners in the Quincy Court and the identification procedure arranged by the police in secret was therefore at a critical stage in the prosecution of petitioners. *See* Kirby v. Illinois, 406 U.S. 682, 689–90, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L. Ed.2d 387 (1970); United States v. Wade, *supra*; Gilbert v. California, *supra*; Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The effective assistance of counsel at a lineup or showing, after the constitutional right to counsel has attached, envisions opportunity for counsel to accumulate firsthand knowledge of all phases and nuances of the process to insure "meaningful confrontation at trial". United States v. Wade, *supra* 388 U.S. at 239, 87 S.Ct. 1926. When the police prevent-

ed petitioners' counsel from observing the mode and manner of the identification process and from hearing comments of the witnesses, the petitioners were precluded from effectively reconstructing the identification itself. And although petitioners' counsel cross-examined the witnesses to the identification at the suppression hearing, the Court in *Wade* emphasized "even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability". *Id.* 388 U.S. at 235, 87 S.Ct. at 1936. The implied finding of the trial judge that "even if defendants' counsel were present . . . when the identifications were made, I fail to see what protection counsel's presence would have afforded the defendants" (amplified findings at 12), cannot excuse or validate improper police procedure. Furthermore, in the adversary system the determination of what may be useful to the defense can properly be made only by counsel. *See, e.g.*, Dennis v. United States, 384 U.S. 855, 875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

■ Moreover, under the circumstances that preceded and attended the Quincy Court proceedings, for Sheila Allen, Mary Holmes and Margaret Munnis at least the whole affair was less a conscious effort to test the individual's ability to identify petitioners than to ratify Sheila Allen's identification of the day before and to establish a united front. They went to the arraignment with information that the men Sheila Allen had identified as the robbers in Boston would be in the courtroom; they sat together; they saw the petitioners in the prisoners' dock; they were present during part of the arraignment of petitioners; and they discussed the petitioners with one another. At the trial Mrs. Munnis testified that she never saw Bouchard's face until she saw him at the Quincy Court. This procedure was impermissibly suggestive to such extent "as to give rise to a very substantial likelihood of irreparable misidentification", Simmons v. United States, 390 U.

S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), by the participants.

The admission in evidence of the out-of-court identifications of the four witnesses (Allen, Holmes, Munnis and Rae) over the petitioners' objections was constitutional error. United States v. Wade, *supra;* Gilbert v. California, *supra. Cf.* Allen v. Moore, 453 F.2d 970, 974 (1st Cir. 1972). In his amplified findings the trial judge found that if admission of that evidence was erroneous, the error was harmless beyond a reasonable doubt and did not contribute to the jury's verdict as to each defendant. The Supreme Judicial Court concurred in the determination that the error was harmless beyond a reasonable doubt. Commonwealth v. Martin et al, *supra* 285 N.E.2d at 125.

## V

### *The issue of harmless constitutional error*

■ The question whether the error is harmless "is every bit as much a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied". Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although the Massachusetts courts have concluded that if there was error at the trial it was harmless, the determination of the federal question "must be based on our [the federal court's] own reading of the record and on what seems to [it] to have been the probable impact of the [erroneously admitted evidence] on the minds of an average jury". Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). In performing this function the federal court does "not sit to re-try state cases *de novo* but, rather, to review for violation of federal constitutional standards". Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972). In Chapman v. California, *supra,* the Court determined that "before a federal constitutional error can be held harmless, the court must be able to de-

clare a belief that it was harmless beyond a reasonable doubt", *id.* 386 U.S. at 24, 87 S.Ct. at 828, and that "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless". *Id.* at 23–24, 87 S.Ct. at 828. Schneble v. Florida, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972), informs us to balance the evidence properly admitted against the erroneously admitted evidence. "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [erroneously admitted evidence] is so insignificant by comparison, that it is clear beyond a reasonable doubt" (*ibid*) that the error was harmless. *See* Milton v. Wainwright, *supra.*

At trial, the introduction of evidence began almost nineteen months after the robbery and the Quincy Court identifications. Twice during the charge the judge instructed the jury that the "basic" issue of fact was the question of identification. Based upon a review of the state court record, it is apparent that the issue of identification rested solely upon eyewitness testimony.[6] There was no circumstantial evidence, such as incriminating fingerprints, *cf.* United States v. Johnson, 403 F.2d 1002 (6th

Cir. 1968), that tied petitioners to the crime. There was no specific evidence independent of the identification evidence that linked petitioners with the robbery. *Cf.* Souza v. Howard, 488 F.2d 462 (1st Cir. 1973); Monteiro v. Picard, 443 F.2d 311 (1st Cir. 1971). Without the Quincy Court identifications the jury would have been faced with determining the issue of guilt solely from the evidence of observations made during the robbery almost nineteen months before and the evidence of identification of the photographs. Offsetting this evidence was the lack of petitioners' fingerprints at the Bank, the alibi evidence as to Martin, and the testimony of the three schoolgirls and Mrs. Ridge.

In balancing the properly admitted and improperly admitted identifications the court cannot ignore the probabilities of human experience. It was pointed out in *Wade* that "[t]he vagaries of eyewitness identification are well known . . . . " 388 U.S. at 228,[7] 87 S.Ct. at 1933. In general, it may be observed the more evidence that is shown the jury of opportunities made available to eyewitnesses to observe defendants at a police-arranged showing a few days after the crime, the greater the probability of the jury's reliance upon the staged

6. The trial judge charged the jury that "[t]here was evidence that on October 14, 1968, when the Boston police arrested the defendant Bouchard on Isabella Street, Bouchard was searched and the police found a gun or revolver, which is Exhibit 9. The possession of that revolver is evidence for your consideration under all of the circumstances as to whether or not it has a tendency to connect Bouchard with the crime with which he is charged". (Tr., vol. 6, at 177) There was no testimony from any of the witnesses to the robbery that Exhibit 9, an automatic pistol, was, was similar to, or resembled, the handgun observed at the time of the robbery. The indictment against Bouchard alleged a revolver as the dangerous weapon. The possession of Exhibit 9 in light of the instruction lent itself to inferences of Bouchard's bad character, and his propensity to behave violently. The court does not take the position that the circumstances set out in this footnote establish another ground for holding the admission of

the gun a violation of Bouchard's due process rights. *See* Moore v. Illinois, 408 U.S. 786, 798–800, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The circumstances are mentioned here only to emphasize the point that the admission of the automatic having been ruled herein a violation of Bouchard's rights and erroneously admitted, the identification issue, with the automatic excluded, is reduced solely to eyewitness testimony.

7. Amplifying that view is the observation that "[the] major cause of injustice in the administration of the criminal law is not, as many believe, the use of confessions but the case of eyewitness identifications". The Dimensions of Eyewitness Identifications, 42 U.Colo.L.Rev. 135 (1970). In the same article it was emphasized that "[the] lineup procedure itself was developed by police because they recognized the unreliability of the identification process, particularly in a face-to-face confrontation". *Id.* at 137–38.

identification.[8] In adopting the *per se* exclusionary rule of testimony of an identification at a lineup staged in the absence of counsel, the Court in Gilbert v. California, *supra,* stressed that " . . . the desirability of deterring the constitutionally objectionable practice . . . is buttressed by the consideration that *the witness' testimony of his lineup identification will enhance the impact of his in-court identification on the jury and seriously aggravate whatever derogation exists of the accused's right to a fair trial".* (Emphasis supplied.) 388 U.S. at 273–74, 87 S.Ct. at 1957. In Allen v. Moore, *supra,* the court condemned police-arranged secret viewings of suspects, and found it reasonable to believe that improper police identification proceedings are "not engaged in unless productive and needed". *Supra* 453 F.2d at 974. Indeed, the prosecutor himself in the trial court pleaded the need of the Quincy Court identifications when he urged the trial judge not to change the previous decision to admit them in evidence.[9]

In assessing the probable impact of the improperly admitted identifications upon the jury, considerations which prompt grave concern for the reliability of properly admitted identifications should not be minimized. Consideration of properly admitted direct evidence normally should take account of any inherent weaknesses in the evidence itself, and the testing of that evidence under cross-examination. Where petitioners were precluded from reconstructing the secret Quincy Court identification, the cross-examination here cannot be viewed as any assurance of reliability. In striking the balance, the Quincy Court identifications should be weighed not only with their prejudicial effect as independent evidence of identification of petitioners [10] but also with the strong probability of their prejudicial effect corroborating and bolstering up [11] the in-court identifications of the witnesses Allen, Holmes, Munnis and Rae, and those of Spacone, Mulvoy and McSweeney as well.[12]

Striking the balance calls for the particular subjective judgment whether the members of an average jury would have found the Commonwealth's case significantly less persuasive had the Quincy Court identifications been excluded. It may properly be assumed the jury followed the instruction of the trial judge that the "basic" issue of fact was the

8. Justice Spaulding of the Supreme Judicial Court emphasized this phenomenon in Commonwealth v. Locke, 335 Mass. 106, 138 N. E.2d 359 (1956), decided in the pre-*Wade-Gilbert* era, when he warned of problems of reliability of identification evidence, saying "[the] identification made in court frequently has little testimonial value as compared with a prior identification made [at a police station lineup] and *such evidence ought to be admissible to corroborate the identification in court".* (Emphasis supplied.) *Id.* at 112. *See also* III, IV Wigmore on Evidence .(Chadbourn Revision) §§ 786a(B)1, 1130.

9. Mr. Russell: " . . . I would have a situation here where the Commonwealth's witnesses would have to testify to an in-court identification presently made from the stand. I would like to have the evidence also go in that the witness observed these particular defendants within ten days after the crime occurred. Otherwise, the jury will hear evidence that they saw pictures but never did see these defendants until practically a year and six months after the crime

occurred. . . . I think it would make the Commonwealth's case substantially weaker unless we were allowed . . . . " (Tr., vol. 2, at 9, 10)

10. Commonwealth v. Powers, 294 Mass. 59, 60–61, 200 N.E. 562 (1936) ; Commonwealth v. Rollins, 242 Mass. 427, 429, 136 N.E. 360 (1922).

11. Commonwealth v. Locke, 335 Mass. 106, 112, 138 N.E.2d 359 (1956).

12. In addition, consideration should be accorded the likelihood of weight being given by the jury to the prosecutor's argument that "[you] may come to the judgment in evaluating the witness that *some witnesses saw certain things that other witnesses did not see.* Some witnesses you might feel, perhaps, saw everything and some others perhaps only bits and pieces, that still, *in the case of the testimony of other witnesses, it has to be related to what other evidence came in before you".* (Emphasis supplied.) (Tr., vol. 6, at 152–53)

question of identification. Even with the improperly admitted evidence before them, the jurors deliberated about six hours until almost midnight before reaching their verdicts. As a practical matter, upon the state court record considered as a whole, it cannot be said with even minimal certainty that the Quincy Court identification evidence did not contribute to the convictions. In the first place, it was apparent to the prosecutor during trial that there was strong likelihood the minds of the jury would find the case against petitioners significantly less persuasive had the improperly admitted identifications been excluded.[13] In appraising the properly admitted testimony, the jury could possibly find that the witnesses during the robbery did not have ample time or opportunity for accurate observations.[14] Further, the jury could have concluded that Mrs. Spacone was not requested to attend the Quincy Court proceedings because the police themselves regarded her identification doubtful after she selected

---

13. *See supra* note 9.

14. The properly admitted evidence was adequate to support the jury's verdict, but there were weaknesses in that evidence. It is apparent from the record that the Bank employees were first made aware of an unusual event occurring in the Bank, and that their attention was first drawn to the robbers, when they heard someone say "Get down on your knees and don't touch a thing". *Sheila Allen*, who admitted to being nearsighted, looked up when the robbers entered the door to the Bank, but she did not notice anything unusual at that time, and paid no more attention to them until she heard the command to "Get down on your knees". She complied with the command immediately and did not see either man thereafter. When she heard the command she looked and saw with a fuzziness of vision the taller man, and also saw the shorter man, and saw that each had a gun. She needed eyeglasses for distant viewing. All this happened in a few seconds. *Mary Holmes* did not notice anything unusual in the Bank until she heard a voice say "Get on your hands and knees". Hearing that, her attention was drawn to two men, one with a long gun, a shorter man with a handgun. She saw the shorter man enter the teller's area. She got on her knees about four or five seconds after she heard the command to do so. She did not see the conduct of the robbers after that time. *Margaret Munnis* was not a Bank employee, and she was reluctant to talk with police after the robbery. She told the jury that while operating the switchboard of her employer, Dunkin Donuts, in an office adjoining the Bank, her attention was drawn to the Bank when Mr. McSweeney said "Look!". Upon looking into the Bank she saw a man pointing a gun at her. She looked at him for a few seconds, and from then on turned away. She was upset, the board was busy, she turned away because the gun upset her. All in one flash she saw the man with the gun and a man kneeling. She never saw Bouchard's face until the Quincy Court proceeding. After the robbery she saw the backs of the men when they started to cross Hancock Street. *Salvatore Rae* heard a noise and looking to his right saw a shotgun facing him, and at that moment a windbreaker dropped at his feet, and a voice said "Get down on the floor". Everything happened fast then. At the command to get on the floor he moved to his left, and knelt on a step of stairs, saw four Bank employees kneeling, saw the back of the man with the shotgun as he moved away, and saw a second man behind the counter, and could not see what the second man was doing behind the counter. *Gloria Spacone's* attention was drawn toward the front of the Bank when she heard a voice say "Everybody down on your knees and don't touch anything". After a second or two she went to her knees. In that second or two she viewed the scene. She did not see the taller man after she knelt down. The shorter man looked at the Bank employees and then the taller man told him to hurry. After that she did not see the shorter man from where she was kneeling, except that she saw the lower half of his body as he moved behind the counter, and saw his whole figure when he opened one of the teller's money drawers. *Julia Mulvoy's* attention was drawn to a man with a gun pointed toward Dunkin Donuts, who turned and walked toward the counter saying "Get on your knees". She "made tracks" to her desk at the rear of the Bank, got on her knees and looked only to the wall. She did not know whether there was one or two more men. She saw only one man. She remained on her knees looking at the wall until she heard the opening of the entrance door. *F. Garrett McSweeney* heard a noise in the Bank, saw two men with guns, a tall man with a rifle or shotgun which was used to push another man, and a short man with a shotgun pointed toward the Dunkin Donut switchboard.

a photograph of someone obviously not Bouchard, and they could have inferred that Mr. McSweeney's testimony lacked reliability because he had not seen any photographs and had not attended the Quincy Court proceedings. Moreover, they could have inferred, after hearing the three schoolgirls testify that they would not be able to recognize again, after almost nineteen months, the men who ran across Hancock Street that identification testimony given nineteen months after the event has little value as compared with an arranged identification made within ten days after the crime.[15] Any one of these uncertainties raises a reasonable possibility of the jury finding observations made of the robbers on the day of the robbery doubtful and unreliable, and that the Quincy Court identifications were more reliable.

 In the absence of any independent evidence of guilt, and in light of these uncertainties, the court cannot say that the properly admitted evidence of guilt was overwhelming and the Quincy Court identification evidence insignificant by comparison, or that the Quincy Court identifications did not contribute to the convictions. The improperly admitted evidence cannot be viewed merely as cumulative to evidence properly admitted. The unique character of the erroneously admitted identification evidence in this case, having the potential of strengthening and bolstering up observations made nineteen months before the trial, cannot be said to be evidence merely tending to prove the same point to which other evidence is offered. *See* Gilbert v. California, *supra* 388 U.S. at 273–74, 87 S.Ct. 1951; Commonwealth v. Locke, 335 Mass. 106, 112, 138 N.E.2d 359 (1956).

The court has given full deference to the relevant facts reliably found by the Massachusetts courts. However, examination of the state court record compels the conclusion that appropriate application of the controlling federal standard requires the determination that this court cannot declare a belief that the admission into evidence of the Quincy Court identifications was harmless error beyond a reasonable doubt.

### The remedy

For the reasons stated as to the effect of the constitutionally erroneous admission of evidence, each petitioner is entitled to the relief sought in his petition, and it is

ORDERED, that the petitions for habeas corpus be and they are hereby granted. It is further

ORDERED, that the issuance and execution of the writ be stayed for a period of sixty days from the date of this order within which time the Commonwealth of Massachusetts may take appropriate steps to commence new trial proceedings against petitioners, and if such steps be taken within the sixty-day period of the stay, issuance and execution of the writ shall be further stayed until further order of this court. It is further

ORDERED, that if no new trial proceedings are commenced within the sixty-day period of the stay, the writ shall issue and be executed forthwith.

15. Commonwealth v. Locke, *supra* note 11, at 112.