## A99A2259. JACKSON v. THE STATE.
(531 SE2d 747)

RUFFIN, Judge.

A Decatur County jury convicted Anthony Otto Jackson of armed robbery, burglary and false imprisonment. Jackson was granted an out-of-time appeal on October 16, 1997. He subsequently filed a motion for new trial, which was denied on April 30, 1999, and now appeals. For reasons which follow, we affirm.

The evidence shows that the victim was awakened at 3:00 a.m. on October 21, 1994, by two men at her back door. They asked if "John" was home. The victim said no, but the men forced their way into the house. One of the men wore a red bandanna over his face, and the other wore a black stocking on his head. The victim recognized the man wearing the red bandanna as Jackson, although she knew him by the names of "Tony Williams" and "Tony Johnson." She identified Jackson's accomplice as Kenya Thomas, and she recognized a third man standing outside her back door, Jimmy Lee Wilson, by the sound of his voice. The victim had seen the three men at a local store earlier in the day, and Jackson and Thomas were still wearing the same clothes. The victim was personally acquainted with Jackson, and he had visited her at her house.

Jackson threatened the victim with his gun and asked her where her money was. When she did not answer, Jackson told Thomas to search the house. Jackson tried to force the victim to the floor and ripped off her nightgown. Meanwhile, Thomas stole $650 from a drawer in the bedroom.

Maurice Adams, who was walking home, heard the victim's screams. He tried to enter her house but saw two men, one wearing a red bandanna and the other a stocking, standing over the victim with guns pointed at her, and he retreated from the door. Adams identified Jackson, whom he had known for seven to ten years, as the man wearing the red bandanna. After hearing Adams, the intruders fled from the house and got into a burgundy car.

Phyllis McDowell testified that around midnight on October 21, 1994, she had given a ride to Jackson, Thomas and Wilson in her

maroon or burgundy colored car. McDowell knew Jackson by the names of "Tony Johnson" and "Tony Williams." After dropping the men off at a street corner, McDowell went to a convenience store and then picked up the three men ten minutes later. When the men got into her car, they seemed "pumped up," and Jackson commented: "That s—— was easy."

The victim identified Jackson from a photographic lineup on November 22, 1994. Jackson's name had previously been entered into the Georgia Crime Information Center ("GCIC") on October 31, 1994, in connection with the warrants issued for Tony Johnson a/k/a Williams. Jackson was arrested in Florida on August 21, 1995, and extradited to Decatur County for trial.

1. Jackson's first three enumerations of error concern the legality of his arrest. First, he claims that he was arrested under an illegal warrant in violation of his Fourth Amendment rights. Second, he claims he was illegally detained for a period of time without a warrant or probable cause in the Decatur County jail. Third, he claims that he was arrested due to information improperly entered into the GCIC.

Jackson was arrested in Florida and detained and transferred to Decatur County pursuant to a message from the Decatur County Sheriff's Department stating that "Anthony Jackson AKA: Tony Williams, Tony Johnson" was wanted in Decatur County under warrants F8556, 8557 and 8558. Those warrants were initially issued for "Tony Johnson (AKA William)" and the name "Jackson" was added later. Jackson contends that these warrants were not issued for him and that "Jackson" was entered into the GCIC in violation of Georgia regulations. In particular, he argues that the State had no authority for entering his name into the GCIC until the victim selected a picture of him from a photo lineup, but the name "Jackson" had been added as an alias to the warrants in the GCIC three weeks before.

Given that Jackson had three aliases, it is not surprising that there was some confusion with the initial warrants. We need not decide, however, whether the irregularities claimed by Jackson rendered the warrants invalid. Even assuming Jackson was illegally arrested and detained, that, without more, is insufficient grounds for ordering a new trial:

> Assuming the arrest to have been illegally made, there is no claim that the conviction rested upon evidence seized as a result of the illegal arrest, or upon a confession secured pursuant to the illegal arrest, etc., but simply that he was illegally arrested. This, alone, does not entitle defendant to

release or a new trial.[1]

Therefore, Jackson's first three enumerations of error are without merit.

2. In his fourth and fifth enumerations of error, Jackson claims that he was identified as the result of an improperly suggestive photographic lineup and that there was no independent basis for his in-court identification. However, because Jackson failed to object to the in-court identification or the admission into evidence of the photographic lineup, his conviction cannot be reversed on this basis.[2]

3. Jackson claims to have received ineffective assistance of counsel. In order to establish ineffectiveness of trial counsel under *Strickland v. Washington*,[3] Jackson must show both that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[4] Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.[5] Furthermore,

[t]here is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance and that any challenged action might be considered sound trial strategy. In the absence of testimony to the contrary, counsel's actions are presumed strategic. The trial court's determination that an accused has not been denied effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous.[6]

Jackson was represented by Curley Doltie, a Florida attorney admitted pro hac vice, and by Richard Greenberg, who was licensed to practice in Georgia. We have reviewed the trial transcript, and we affirm the trial court's finding that their assistance was not ineffective.

(a) Jackson complains that his attorneys failed to pursue an alibi defense. In the hearing on his motion for new trial, Jackson maintains that he was in New York on October 21, 1994, the day of the

---

[1] *Johnson v. State*, 128 Ga. App. 69, 70 (2) (195 SE2d 676) (1973).

[2] *Anderson v. State*, 238 Ga. App. 866, 874 (5) (519 SE2d 463) (1999); *Curry v. State*, 217 Ga. App. 623, 626 (2) (458 SE2d 385) (1995).

[3] 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984).

[4] *Bowley v. State*, 261 Ga. 278, 280 (4) (404 SE2d 97) (1991).

[5] *Stephens v. State*, 265 Ga. 120, 121-122 (2) (453 SE2d 443) (1995).

[6] (Punctuation omitted.) *Binion v. State*, 222 Ga. App. 333, 334 (1) (474 SE2d 208) (1996).

crime. To support this contention, he presented a temporary license which he obtained in New York on October 28, 1994. At the hearing on the motion for new trial, Jackson also presented or made reference to witnesses who could place him in New York at approximately the time of the crime, but not on the exact date. We cannot say that Jackson has shown he had a strong alibi defense. In the absence of testimony to the contrary, we will presume counsel's decision not to pursue an alibi defense to be a choice of trial strategy.

(b) Jackson objects to the failure of his attorneys to oppose his extradition from Florida to Georgia and his detention before a valid warrant was issued. These matters do not have any bearing on Jackson's trial.

(c) Jackson complains that his attorneys failed to object to comments made by the prosecution at closing arguments regarding Jackson having been "on the run." An objection may simply have highlighted the point being made by the prosecution, so we cannot say this was not a valid exercise of professional judgment.

(d) Jackson claims that his attorneys did not read the transcript of the trial of his accomplices, but his attorneys attempted to impeach prosecution witnesses based on testimony from that trial.

(e) Jackson complains that his counsel failed to interview the prosecution's witnesses before trial. We have reviewed the record, and counsel did not appear to be unprepared for these witnesses.

(f) Jackson maintains that counsel should have called Jean Paultre Pierre to impeach the testimony of the victim and Adams. Pierre, who is known by a street name of "Jean Jean," had written a "sworn statement," presented at Jackson's motion for a new trial, which alleges that witness Adams and the victim had conspired to fabricate the crime. Pierre maintains that Adams had taken the victim's money and "smoked it up." We are not in the position to second-guess trial counsel with respect to the decision not to present this witness' testimony. Counsel may have judged Pierre to be untruthful or subject to impeachment by the prosecution.

(g) Counsel failed to obtain certified copies of the previous drug and assault convictions of witness Adams. The trial court noted that, in the absence of certified copies, counsel could not introduce those convictions into evidence. Perhaps counsel could have impeached Adams if they had obtained certified copies of his convictions. On the other hand, evidence of Adams' previous convictions may not have substantially helped Jackson's case. Adams was cross-examined and questioned about prior inconsistent statements. Counsel may not have anticipated a need to further question Adams' veracity. In the absence of testimony indicating why counsel did not obtain certified copies of Adams' convictions, we cannot hold, as a matter of law, that such failure amounted to ineffective assistance of counsel.

(h) Finally, in his sixth enumeration of error, Jackson complains of ineffective assistance of counsel for their failure to object to the introduction of the photographic lineup and because there was no basis for Jackson's in-court identification. Such an objection could not have been sustained.

The victim identified Jackson from a photographic lineup of six men. All of the men were shown full-faced, with no masks or other facial covering. Photographic lineups are a valid method of pretrial identification:

> [C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.[7]

There is no evidence that the picture of Jackson was improperly suggested to the victim as that of the perpetrator. Although the assailants wore masks during the robbery, we do not find that a full-faced lineup makes the victim's identification of Jackson unreliable. She had previously informed the police that she knew her attackers, and any attempt to partially obscure the faces in the lineup would have made the pretrial identification less reliable, not more so.

The basis for the in-court identification of Jackson by the victim and Adams is that they knew him. This is not a case of an in-court identification of a defendant who was a stranger to the witness at the time of the crime.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 17, 2000 —
RECONSIDERATION DENIED MARCH 30, 2000 — 

*Paul Fryer*, for appellant.
*J. Brown Moseley, District Attorney, Anthony E. Paulsen III, Assistant District Attorney*, for appellee.

---

[7] (Punctuation omitted.) *Simmons v. United States*, 390 U. S. 377, 384 (88 SC 967, 19 LE2d 1247) (1968).